**Billy Maurice OGDEN, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 17376.**

United States Court of Appeals Ninth Circuit.

May 16, 1962.

Rehearing Denied June 20, 1962.

Daniel G. Marshall, Los Angeles, Cal., for appellant.

Wirin & Okrand, Los Angeles, Cal., Gerald H. Gottlieb, Beverly Hills, Cal., as amicus curiae, for American Civil Liberties Union.

Before CHAMBERS, MERRILL and BROWNING, Circuit Judges.

BROWNING, Circuit Judge.

The defendant was convicted by a jury under both counts of a two-count indictment alleging violations of 18 U.S.C.A. § 1001. He was sentenced to two years' imprisonment on each count, the sentences to run concurrently, and has appealed. The case is remanded for a further hearing with respect to certain problems arising under the Jencks Act.

I

■ Count One of the indictment alleged that in a matter within the jurisdiction of the Department of the Air Force defendant had filed a "Certificate of Non-affiliation with Certain Organizations," in which he had falsely denied that he had been a member of the Communist Party. Count Two alleged that in the same document defendant had falsely denied that he had been affiliated or associated with the Communist Party. The defendant's threshold contention is that a violation of 18 U.S.C.A. § 1001 cannot be founded upon false statements in a Certificate of Non-affiliation because there was no federal statute or presidential executive order specifically authorizing the use of such a Certificate. We conclude that the use of the Certificate was authorized, and that application of 18 U.S.C.A. § 1001 to false statements in the Certificate did not violate constitutional limitations.

■ The Certificate of Non-affiliation was completed by defendant as an employee of a private concern having contracts with the United States Air Force, as part of an application for security clearance under the Industrial Personnel Security Program.[1] The Certificate inquired into his membership in, and affiliation or association with, a list of organizations identified as those "designated by the Attorney General, pursuant to Executive Order 10450, as having interests in conflict with those of the United States."[2] The first organization listed was the "Communist Party, U. S.A., its subdivisions, subsidiaries and affiliates."

The defendant recognizes that under the decision in Greene v. McElroy, 360 U.S. 474, 506, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), the Department of Defense was authorized to fashion and apply an industrial security program affording sufficient safeguards to the constitutional rights of the affected employees. But defendant contends that the inquiry ad-

1. An italicized notice appearing at the top of the Certificate read, in part ,"Title 18, United States Code 1001, makes it a criminal offense, punishable by a maximum of five (5) years' imprisonment, $10,000 fine, or both, knowingly to make a false statement or representation to any Department or Agency of the United States, as to any matter within the jurisdiction of any Department or Agency of the United States. This includes any statement made herein which is knowingly incorrect, incomplete or misleading in any important particular."

2. See § 12 of Exec.Order No. 10450, 18 Fed.Reg. 2489 (1953), incorporating ¶3, Part III of Exec.Order No. 9835, 12 Fed. Reg. 1935 (1947), 5 U.S.C.A. § 631 note. We reject defendant's contention that reference in the Certificate to this so-called "Attorney General's list" gave rise to constitutional problems solely because the list was created initially for use in the screening of federal employees rather than employees of private industry. Compare Uphaus v. Wyman, 360 U.S. 72, 79, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959).

dressed to him in the Certificate of Non-affiliation intruded upon an area protected by the First Amendment and that, under the rationale of Greene, its use as a part of an industrial security program can be justified only if explicitly authorized by Congress or the President. Defendant asserts that since express authorization is lacking, the prosecution must fail.

Any inquiry which requires an individual to disclose his relationship with the Communist Party imposes some inhibition upon his freedom of association. But Greene does not require that every governmental intrusion into a general area subject to constitutional protection be authorized in minute detail. The specificity required depends in part upon the nature and extent of the intrusion, and its purpose and effect. Our inquiry is whether the Department of Defense was sufficiently authorized to ask this defendant these questions.

The Supreme Court did not indicate in Greene whether the authority of the Department of Defense to establish an industrial security program was derived from the Congress or the President, or both. For present purposes we may confine our examination to the line of authority extending from the President.

The pertinent delegation of authority during the relevant period was contained in Executive Order 10501.[3] This Presidential Order established a comprehensive program for the classification, marking, custody, dissemination, and transmission of official information relating to the national defense. The Order directed departments and agencies having direct responsibility for the national defense to classify such material and control its subsequent dissemination in accordance with the standards and procedures stated in the order. The Order made it clear that classified material was to be made available only to "authorized persons, in or out of federal service,"[4] and that it was the duty of the Department involved to see that "unauthorized persons are prevented from gaining access thereto,"[5] as the Order stated, "by sight or sound."[6] More specifically, the Order directed that "knowledge or possession of classified defense information shall be permitted only to persons whose official duties require such access in the interest of promoting national defense and only if they have been determined to be trustworthy,"[7] and that "classified defense information shall not be disseminated outside the executive branch except under conditions and through channels authorized by the head of the disseminating department * * *."[8]

Fairly read, Executive Order 10501 authorized the establishment by the Department of Defense[9] of a system for

---

3. 18 Fed.Reg. 7049 (1953). Following the decision in Greene, Exec.Order No. 10501 was supplemented by Exec.Order No. 10865, 25 Fed.Reg. 1583 (1960), 50 U.S.C.A. § 401 note. The first two sections of Exec.Order No. 10865 contain a direct restatement of the authority granted the Department to issue regulations protecting the release of classified information within industry. The bulk of Exec. Order No. 10865, however, is devoted to the establishment of procedural safeguards applicable to the denial or revocation of authorization for access to classified information, in an evident effort to meet the constitutional problems suggested in Greene. Exec.Order No. 10865 adds nothing to Exec.Order No. 10501 in the nature of more specific authorization for inquiry into the organizational affiliations of persons employed in private industry. Nor did a subsequent amendment of Exec.Order No. 10865 (see Exec.Order No. 10909, 26 Fed.Reg. 508 (1961)) or various direct amendments of Exec.Order No. 10501 (see Exec.Order No. 10816, 24 Fed.Reg. 3777 (1959); Exec.Order No. 10901, 26 Fed. Reg. 217 (1961); Exec.Order No. 10964, 26 Fed.Reg. 8932 (1961)) do so.

4. Exec.Order No. 10501, § 5(i), 18 Fed. Reg. 7049 (1953).

5. Id., § 6.

6. Id., § 6(e).

7. Id., § 7.

8. Id., § 7(b).

9. The indictment alleged a false statement in a matter "within the jurisdiction of the Department of the Air Force." The Department of the Air Force derived its au-

screening all persons who sought access to defense information officially classified by the Department—including employees of private industry. The standard was to be two-fold: (1) whether the individual's official duties required access to such information in the interest of national defense, and (2) whether the individual was trustworthy. Sufficient authority to establish a program for screening privately employed persons seeking access to classified material or participation in sensitive activity has been found in statutory authorization no more explicit than this Executive Order.[10]

The question remains whether the Department was authorized, as a part of this screening program, to inquire as to the employee's relationships with the Communist Party. Executive Order 10501 imposed a duty upon the Department of Defense to confine the dissemination of classified defense information to persons who "have been determined to be trustworthy." The Department of Defense interpreted the standard of "trustworthiness" as requiring that clearance be denied or revoked if "access to classified information by the person concerned is not clearly consistent with the interests of national security."[11] The courts have repeatedly acquiesced in the determination of other branches of the federal government that the Communist Party is controlled by the foreign nation whose strained relationship with our own is largely responsible for our vast defense effort.[12]

In inquiries related to security, the disclosure of Communist Party membership may, at the very least, provide "a significant investigatory lead."[13] The duty imposed upon the Department by Executive Order 10501 compelled inquiry by the Department into the applicant's possible relationships with the Party.

The Department of Defense did not claim authority to deny or revoke the security clearance of a private person sole-

thority to administer the industrial security program with respect to defendant's employer from the Armed Forces Industrial Security Regulation § 72.1–300, 20 Fed.Reg. 6773, 6776 (1955), providing for the assignment of Department of Defense functions in this area to the various Military Departments.

10. Parker v. Lester, 227 F.2d 708, 715 (9th Cir. 1955). Compare Homer v. Richmond, 292 F.2d 719, 722–723 (D.C. Cir. 1961); Borrow v. F.C.C., 109 U.S. App.D.C. 224, 285 F.2d 666, 668 (1960), cert. denied 364 U.S. 892, 81 S.Ct. 223, 5 L.Ed.2d 188; Graham v. Richmond, 106 U.S.App.D.C. 288, 272 F.2d 517, 521 (D.C.Cir. 1959).

11. Industrial Personnel Security Review Regulation, § 67.3–1, 20 Fed.Reg. 1553, 1555 (1955).

12. See Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 41–55, 93–96, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); Barenblatt v. United States, 360 U.S. 109, 127–129, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Galvan v. Press, 347 U.S. 522, 529, 74 S.Ct. 737, 98 L.Ed. 911 (1954); Carlson v. Landon, 342 U.S. 524, 534–536, 72 S.Ct. 525, 96 L Ed. 547 (1952). See also Dennis v. United States, 341 U.S. 494, 510–511, 71

S.Ct. 857, 95 L.Ed. 1137 (1951); American Communications Ass'n, CIO v. Douds, 339 U.S. 382, 388, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Borrow v. FCC, 109 U.S. App.D.C. 224, 285 F.2d 666, 669–670 (1960), cert. denied 364 U.S. 892, 81 S. Ct. 223, 5 L.Ed.2d 188.

13. Scales v. United States, 367 U.S. 203, 211, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961). See also Borrow v. FCC, 109 U.S.App. D.C. 224, 285 F.2d 666, 669–670 (1960), cert. denied 364 U.S. 892, 81 S.Ct. 223, 5 L.Ed.2d 188. Compare Wilkinson v. United States, 365 U.S. 399, 413, 81 S.Ct. 567, 5 L.Ed.2d 633 (1961); Barenblatt v. United States, 360 U.S. 109, 130, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959). Congressional awareness of the special relevance of Communist Party association to the security of classified information is reflected in the Internal Security Act of 1950, 64 Stat. 987 (1950), 50 U.S.C.A. § 781 et seq. Section 4(c) of that Act (50 U.S.C.A. § 783(c)) makes it unlawful for a member of a Communist organization to receive such information. Section 5 (50 U.S.C.A. § 784) requires disclosure of membership in Communist organizations by those seeking employment in defense facilities, and makes it unlawful for a member of a Communist-action organization (including the Party) to work in a defense facility.

ly on the basis of disclosure of a relationship between that person and the Communist Party. Under the regulations, the existence of such a relationship was one of many factors to be considered,[14] and "the ultimate determination of whether such clearance should be granted or continued must be an overall common-sense one, based on all available information." [15] The Certificate of Non-affiliation was part of the initial application for security clearance.[16] Thus the Department claimed only that a delegation of authority to determine whether an individual may be trusted with classified defense material carries with it authority to ask him, at the threshold of the inquiry, about his relationship if any with the Communist Party. That claim we sustain.

 Defendant did not reject the inquiry, but responded to it—falsely. In these circumstances, we understand the defendant to attack only the sufficiency of the delegation to the Department of Defense of authority to make the inquiry, and not the constitutional basis of the governmental operation in which the inquiry was made. One who has given false answers to materal inquiries regarding a matter colorably within the authority of a government agency may not defend a subsequent prosecution under 18 U.S.C.A. § 1001 on the ground that the governmental operations involved were in fact vulnerable to constitutional attack.[17]

It seems abundantly clear in the present state of the authorities that the application of 18 U.S.C.A. § 1001 to a false statement in a Certificate of Non-affiliation regarding defendant's relationship with the Communist Party [18] raises no substantial constitutional problem. The relevance of the inquiry to the protection of a vital national interest is plain. The restriction upon freedom of association is limited. The power of the federal government to require disclosure of membership in the Communist Party on pain of criminal punishment has been sustained with less at stake than the inviolability of classified defense information.[19] The interest of the federal government in determining

14. Membership in, or affiliation with, a Communist organization fell within one of 22 listed categories of activity or association which might be the basis for denial or revocation of clearance for access to classified information. Industrial Personnel Security Review Regulation, § 67.3–2(a) (4), 20 Fed.Reg. 1553, 1556 (1955). Deliberate falsification of a material fact in a security questionnaire or similar document was another. Id., § 67.3–2(a) (16).

15. Industrial Personnel Security Review Regulation, §. 67.3–2(a), 20 Fed.Reg. 1553, 1555 (1955).

16. The initial step in screening an employee for clearance under the Industrial Security Program was the filing of an application with the Department of Defense by the employer. The application consisted of three documents, one of which was the Certificate of Non-affiliation, signed by the employee. Industrial Security Manual for Safeguarding Classified Information, ¶ 20a, p. 18 (dated Sept. 21, 1956, revised Nov. 20, 1957). A description of the Industrial Security Program in essentially the form in which it functioned at the time of the alleged offense is found in 8 Stan.L.Rev. 234 (1956).

17. Kay v. United States, 303 U.S. 1, 6, 58 S.Ct. 468, 82 L.Ed. 607 (1938); United States v. Kapp, 302 U.S. 214, 217–218, 58 S.Ct. 182, 82 L.Ed. 205 (1937); Humble Oil & Ref. Co. v. United States, 198 F.2d 753, 756 (10th Cir. 1952), cert. denied 344 U.S. 909, 73 S.Ct. 328, 97 L.Ed. 701; United States v. Barra, 149 F.2d 489, 490 (2d Cir. 1945); United States v. Meyer, 140 F.2d 652, 655 (2d Cir. 1944). Compare United States v. Williams, 341 U.S. 58, 68–69, 71 S.Ct. 595, 95 L.Ed. 747 (1951).

18. The Attorney General's list contains the names of many organizations, but in this criminal prosecution for false denial of membership or affiliation with a single organization, we are not concerned with whether defendant might have resisted the inquiry into his organizational associations on the ground that it was unjustifiably broad. Compare Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L. Ed.2d 231 (1960).

19. See Wilkinson v. United States, 365 U.S. 399, 81 S.Ct. 567, 5 L.Ed.2d 633 (1961); Braden v. United States, 365 U.S. 431, 81 S.Ct. 584, 5 L.Ed.2d 653 (1961); Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959).

the qualifications of persons seeking to operate a radio station has been held to justify the refusal to license one who declines to state whether he is a member of the Communist Party.[20] The interest of a state in determining the qualifications of applicants for admission to the bar has been held a sufficient basis for denying admission to one who refuses to answer inquiries regarding Communist Party membership.[21] And a state's interest in determining the fitness of teachers, subway conductors, and municipal employees generally is said to be enough to sustain the discharge of such employees if they refuse to respond to the same inquiry.[22] The power to punish a knowingly false denial of affiliation with or membership in the Communist Party in response to an inquiry undertaken in furtherance of the vital governmental interest in the security of classified defense information would seem to follow a fortiori.[23]

## II

The defendant asserts that he was denied rights conferred upon him by the Jencks Act.[24] We conclude that errors did occur, that some were harmless, but that others require a remand for further consideration by the District Court.

The government sought to prove that defendant belonged to the Communist Party while at the University of Oklahoma during the period 1946–1949, relying primarily upon the testimony of three of defendant's fellow students: Blackstock, Glass, and Hunt. Defendant sought the production of Jencks Act statements of each of these witnesses. Demands under the Act were also made in connection with the testimony of the witness Harris.

We will discuss each of the witnesses in turn. Preliminarily, we state our understanding of the general obligations of the Court and of the parties in the administration of the Act. The Jencks Act was intended to protect government files from unwarranted disclosure, but it was equally its purpose to make available to the defendant certain of the materials in the possession of the

20. Borrow v. FCC, 109 U.S.App.D.C. 224, 285 F.2d 666 (1960), cert. denied 364 U.S. 892, 81 S.Ct. 223, 5 L.Ed.2d 188. See also Homer v. Richmond, 292 F. 2d 719 (D.C.Cir. 1961). Compare generally Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 88–105, 81 S.Ct. 1357, 6 L.Ed. 2d 625 (1961).

21. Konigsberg v. State Bar of Cal., 366 U.S. 36, 51–52, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); In re Anastaplo, 366 U.S. 82, 89, 81 S.Ct. 978, 6 L.Ed.2d 135 (1961).

22. Beilan v. Board of Public Education, 357 U.S. 399, 78 S.Ct. 1317, 2 L.Ed.2d 1414 (1958); Lerner v. Casey, 357 U.S. 468, 78 S.Ct. 1311, 1324, 2 L.Ed.2d 1423 (1958); Garner v. Board of Public Works, 341 U.S. 716, 71 S.Ct. 909, 95 L.Ed. 1317 (1951).

23. Cf. American Communications Ass'n CIO v. Douds, 339 U.S. 382, 404–405, 412–413, 70 S.Ct. 674, 94 L.Ed. 925 (1950); West v. United States, 274 F. 2d 885, 889 (6th Cir. 1960), cert. denied 365 U.S. 811, 819, 81 S.Ct. 688, 5 L.Ed.2d 691; Lohman v. United States, 251 F. 2d 951, 954 (6th Cir. 1958), cert. denied

361 U.S. 923, 80 S.Ct. 290, 4 L.Ed.2d 239; Marzani v. United States, 83 App.D.C. 78, 168 F.2d 133, 141–142 (1948), aff'd 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431, adhered to 336 U.S. 922, 69 S.Ct. 513, 93 L.Ed. 1075. See also Leedom v. International Union, of Mine, Mill & Smelter Workers, 352 U.S. 145, 148, 77 S.Ct. 154, 1 L.Ed.2d 201 (1956); United States v. Barra, 149 F.2d 489, 490 (2d Cir. 1945). Even if it were open to defendant to make it (see n. 17, supra, and related text), we think no serious argument could be advanced that the Department of Defense violated constitutional limitations in establishing the screening program. For if it is assumed that the inhibitions imposed upon Congress by the First Amendment also limit executive power [Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 143, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (concurring opinion)], as they do the power of the Federal judiciary [Bridges v. California, 314 U.S. 252, 260, 62 S.Ct. 190, 86 L.Ed. 192, (1941)], the extent of those inhibitions would be no greater when applied to the executive than when applied to the Congress or, through the Fourteenth Amendment, to the states.

24. 18 U.S.C.A. § 3500.

government which might lead to the impeachment of government witnesses.[25] "The command of the statute is thus designed to further the fair and just administration of criminal justice, a goal of which the judiciary is the special guardian." Campbell v. United States, 365 U.S. 85, 92, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961). An affirmative duty is placed upon the trial court to secure the information which is necessary to a proper ruling on particular requests for production in the light of the statutory purposes. The prosecution and defense have a duty beyond that imposed by their "adversary positions in the trial proper" to assist the Court in this effort. Campbell, supra, at 95, 81 S.Ct. 421.

█ It is perhaps worth adding that the effectiveness of the Act, and the realization by defendant of the rights which the Act accords him, necessarily depend upon a fair and full disclosure by the government. The Court and the defendant must grope; only the government knows the content of its own files. When the question of Jencks Act production is properly raised by the defendant, it is incumbent upon the government to make the fullest disclosure to the Court withholding nothing from the Court which might conceivably come within the Act.

██ Recognizing all of this, it remains true that the burden rests upon the defendant to invoke the statute at the appropriate time. The Act provides that the Court shall order the production of statements to which the defendant is entitled "on motion of the defendant."

"No ritual of words" is required,[26] but the defendant must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry. If he fails to do so he may not assert, on appeal, that failure to order production or to undertake further inquiry was error.[27] It would defeat the important purposes of the Act to give its provisions a hypertechnical interpretation. But it would be equally destructive to permit the statute to be used as a device for creating inadvertent error. The responsibility for fairly directing the attention of the Court to the precise demand submitted for the Court's determination is appropriately placed upon the Defendant, who seeks the statute's benefits.

██ ██ 1. *Harris*, a Captain in the United States Air Force, was the first to testify. His direct examination consisted of an unsuccessful effort to lay a foundation for the introduction into evidence of the Certificate of Non-affiliation, signed by defendant, as a business record of the Air Force.

Cross-examination revealed the existence of a National Agency Check File containing FBI reports pertaining to the defendant. Defendant moved for production of the entire file either to him or to the Court for examination to determine whether it contained the statements of government witnesses, reports regarding interviews with such witnesses, or, generally "any information which would be helpful or tend to be helpful to the de-

25. S.Rep. No. 981, 85th Cong., 1st Sess., Aug. 15, 1957, pp. 2, 3; H.R.Rep. No. 700, 85th Cong., 1st Sess., July 5, 1957, pp. 2, 4.

26. Howard v. United States, 108 U.S.App. D.C. 38, 278 F.2d 872, 874 (D.C.Cir. 1960).

27. United States v. Annunziato, 293 F.2d 373, 382 (2d Cir. 1961), cert. denied 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134; United States v. Klinghoffer Bros. Realty Corp., 285 F.2d 487, 493 (2d Cir. 1960); United States v. Simmons, 281 F.2d 354, 358 (2d Cir. 1959); Johnston v. United States, 260 F.2d 345, 347 (10th Cir.

1958), cert. denied 360 U.S. 935, 80 S.Ct. 1454, 4 L.Ed.2d 1547; United States v. Tellier, 255 F.2d 441, 449 (2d Cir. 1958), cert. denied 358 U.S. 821, 79 S.Ct. 33, 3 L.Ed.2d 62. Compare Communist Party of United States v. Subversive Activities Control Board, 107 U.S.App.D.C. 279, 277 F.2d 78, 81 (1959), aff'd 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625: ("Failure * * * to grant a motion not made is not reversible error * * *"); Rios v. United States, 256 F.2d 173, 178 (9th Cir. 1958), vacated on other grounds 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (under Jencks decision).

fendant in the presentation of his defense."

The motion was properly denied. There is no support for such sweeping discovery under the Federal Rules of Criminal Procedure,[28] the Jencks decision,[29] or the Jencks Act. The legislative history of the Jencks Act makes it explicitly clear that Congress intended to preclude just such broad disclosure of the government's investigative files as defendant sought here.[30] There was no suggestion that the file contained a Jencks Act statement relating to the subject matter of Harris's direct testimony.[31] As to statements relating to the subject matter of the testimony of potential government witnesses not yet heard, the demand was premature. For the same reason it was not error to deny defendant's pre-trial Jencks Act demands for statements of this and other witnesses.[32] This is not to suggest that it is always, or even normally, inappropriate for the government to produce such statements before trial. Where the identity of the government's witnesses and the probable nature of their testimony is known, speedy resolution of Jencks Act problems by early and full disclosure may serve the interests of all concerned.

2. *Blackstock* testified that in the fall of 1946 defendant introduced him to Shaw (identified as an official of the Communist Party), that defendant later inquired whether Shaw had invited Blackstock to join the Party and that, in the course of this conversation, defendant showed Blackstock his "Communist Party card," bearing his "Party name."

Pursuant to defendant's motion at the close of Blackstock's direct examination at the first trial of this case,[33] the government had produced a statement signed by the witness on July 1, 1958. At the close of Blackstock's direct examination in the present trial, defendant moved for the production of "written statements given by this witness to the government * * * aside from the statement already given us. * * *" The government replied that there were none. The Court and defense counsel accepted the government's statement. Defendant cannot now be heard to suggest that a different course of action might have been more appropriate.

Defendant then moved for the production of "any statements made by any FBI agent to any other FBI agent concerning interviews with" Blackstock. Government counsel responded, "Under the provisions of the Jencks statute, we refuse, your Honor." The Court properly denied the motion. All FBI reports "concerning interviews with [a] witness" are not automatically excluded from the Act, but neither are they necessarily producible. Like any other "statement," an FBI Interview Report is producible under the Act as a "statement" of the witness

28. Fed.R.Crim.P. 16, 17(c), 18 U.S.C.A. See also Louisell, Criminal Discovery: Dilemma Real or Apparent?, 49 Calif.L. Rev. 56, 68–74 (1961).

29. Jencks v. United States, 353 U.S. 657, 667, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957).

30. S.Rep. No. 981, 85th Cong., 1st Sess., Aug. 15, 1957, pp. 2–3; H.R.Rep. No. 700, 85th Cong., 1st Sess., July 5, 1957, pp. 2–7. See 56 Mich.L.Rev. 314, 316, n. 15 (1957).

31. Cf. United States v. Neverline, 266 F. 2d 180, 183–184 (3d Cir. 1959).

32. Roberson v. United States, 282 F.2d 648, 650 (6th Cir. 1960), cert. denied 364 U.S. 879, 81 S.Ct. 167, 5 L.Ed.2d 102; Bullock v. United States, 265 F.2d 683, 692-693 (6th Cir. 1959), cert. denied 360

U.S. 932, 79 S.Ct. 1452, 3 L.Ed.2d 1546; Johnston v. United States, 260 F.2d 345, 347 (10th Cir. 1958), cert. denied 360 U. S. 935, 80 S.Ct. 1454, 4 L.Ed.2d 1547. Cf. Rios v. United States, 256 F.2d 173, 178 (9th Cir. 1958), vacated on other grounds, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688. But cf. Fryer v. United States, 93 U.S.App.D.C. 34, 207 F.2d 134, 137 (1953), cert. denied 346 U.S. 885, 74 S.Ct. 135, 98 L.Ed. 389. See 56 Mich. L.Rev. 314, 317 (1957).

33. The indictment was returned in September, 1959. The defendant was tried and convicted in July, 1960, but the trial court granted defendant's motion for new trial. The second trial was held in January, 1961, resulting in a verdict of guilty and the entry of the judgment of conviction from which this appeal is taken.

interviewed if the recitals in the report were "signed or otherwise adopted or approved" by the witness or if the report contains a "substantially verbatim recital" of the witness's oral statement and is prepared contemporaneously with the interview.[34] Inclusion of a witness's Jencks Act "statement" in an FBI report which includes other, nonproducible material, neither precludes the production of the "statement" nor requires delivery of the entire report to the defendant. The nonproducible materials in the report may be excised by the Court on *in camera* inspection. On the other hand, it was the deliberate purpose of Congress to limit production to statements, whether or not in the form of an FBI Interview Report, which could properly be attributed to the witness himself. FBI reports which contain only the agent's epitomization, interpretation, or impression of an interview are not producible, though clearly they "concern" it.[35] When the motion was made and denied, there was nothing before the Court to indicate that FBI reports of either description existed. In the broad terms in which it was submitted, the motion was without support in the Act.

Counsel proceeded to cross-examine the witness, and developed the fact that Blackstock had been interviewed a total of some twenty or thirty times over a period of eleven years by different FBI agents with respect to the matters to which he testified on direct examination, and that during this time he had been asked for, and had given, but one signed statement— the statement of July 1, 1958.[36] Blackstock also testified that during an interview in 1958 he had observed the FBI agents taking notes.

At this point defense counsel sought leave to defer further cross-examination, which was denied. Defendant made no further inquiry, request, or motion with respect to the existence and production of possible Jencks Act statements. The witness was then excused.

Defendant suggests now that FBI reports relating to Blackstock's oral statements when interviewed probably existed and may have been producible under the Jencks Act, and that in any event the FBI's agent's notes should have been produced. We can agree that it was all but certain that the government had in its possession FBI reports reflecting Blackstock's oral statements, made over the years, regarding the critical incident to which he testified at trial. Moreover, it is clear that the repeated examination of the witness over an extended period regarding a single, limited occurrence would render his actual recollection of that occurrence so potentially unreliable by the time of the trial that a comparison

---

34. 18 U.S.C.A. § 3500(e). Campbell v. United States, 365 U.S. 85, 93–95, 81 S. Ct. 421, 5 L.Ed.2d 428 (1961). See also United States v. Annunziato, 293 F.2d 373, 381 (2d Cir. 1961), cert. denied 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134; Karp v. United States, 277 F.2d 843, 848 (8th Cir. 1960), cert. denied 364 U.S. 842, 81 S.Ct. 80, 5 L.Ed.2d 65. As to the producibility of interview reports prepared by an agent who is himself a witness, see Clancy v. United States, 365 U.S. 312, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961); Holmes v. United States, 271 F. 2d 635, 638 (4th Cir. 1959).

35. Palermo v. United States, 360 U.S. 343, 352–353, 358–360, 79 S.Ct. 1217, 3 L.Ed. 2d 1287 (1959); United States v. Annunziato, 293 F.2d 373, 381 (2d Cir. 1961), cert. denied 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134; United States v. Crosby, 294 F.2d 928, 951 (2d Cir. 1961) (ap-

peal pending). As to the meaning of "substantially verbatim" and "contemporaneously," compare the restrictive reading of Campbell v. United States, 296 F.2d 527, 532 (1st Cir. 1961), with the more liberal construction of United States v. Thomas, 282 F.2d 191, 194 (2d Cir. 1960), and United States v. McKeever, 271 F.2d 669, 675 (2d Cir. 1959).

36. Blackstock was first interviewed in January or February of 1947. He was re-interviewed eight or nine times during that year, and from one to three times during each of the ensuing years up to and including 1958, with the possible exception of 1952. The agents were "always changing," but the subject matter of the interviews did not: "After awhile I got tired of talking about the same old thing, and going over and over and over this stuff."

of his testimony with his initial statements would be of particular importance.

But the defendant did not inquire about the existence of such reports, nor did he ask the Court to do so. He did not ask for the production, to himself or to the Court, of reports if any which may have qualified as "statements" under the Act; he did not ask, then or later, for the production of the agent's notes. He asked nothing of the Court, and the Court did nothing; there is no basis upon which we can now say that the Court committed error requiring the reversal of this criminal conviction.

■■■■ 3. *Glass* testified that in the fall of 1947 defendant informed him that he was acceptable for membership in the Communist Party. Glass further testified that defendant was present, together with Shaw (the officer of the Communist Party), when Glass executed applications for membership on behalf of himself and his wife.

A statement signed by Glass on March 28, 1958, at Mill Valley, California, was produced at the first trial. On cross-examination Glass testified that a week or ten days prior to the date of this statement he had been interviewed by FBI agents and had observed them taking notes. Defendant moved for the production of the notes. Government counsel stated that he did not have them.[37] Defendant moved that the government produce either the notes or an explanation from the FBI agents. The motion was denied.[38]

The testimony of the witness indicated the creation of a writing to which defendant might well have been entitled under the Jencks Act. Because the defendant could have, but did not, explore the matter in cross-examination, for the purposes of this appeal we lay aside the possibility that the notes may have been read to the witness and that he may have "adopted or approved" them, thus rendering them producible under 18 U.S. C.A. § 3500(e) (1).[39] Nonetheless, the notes may have constituted a "substantially verbatim recital" of defendant's oral statement within the meaning of 18 U.S.C.A. § 3500(e) (2).[40] That was enough to require the granting of defendant's motion for further inquiry.[41] Contrary to the government's suggestion, the notes would be producible, and the requested inquiry would therefore be appropriate, even if it had affirmatively appeared that all of the information which the notes contained was included in the signed statement of March 28,

37. Government counsel added that he had "no knowledge of their existence," and stated, "I was further informed that I was delivered all copies of original notes and these were not any that I received. That information was given me by the FBI."

38. Although the Court did not act upon the motions immediately, it indicated on the record shortly thereafter that it had denied all motions then pending.

39. Campbell v. United States, 365 U.S. 85, 93–95, 81 S.Ct. 421, 5 L.Ed.2d 428; United States v. Annunziato, 293 F.2d 373, 382 (2d Cir. 1961), cert. denied 368 U.S. 919; compare Campbell v. United States, 296 F.2d 527, 530, 532 (1st Cir. 1961).

40. Killian v. United States, 368 U.S. 231, 239, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).

41. Campbell v. United States, 365 U.S. 85, 92–93, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961); United States v. Chrisos, 291 F.2d 535, 538 (7th Cir. 1961), cert. denied 368 U.S. 829, 82 S.Ct. 50, 7 L.Ed.2d 32. A hearing to receive extrinsic evidence may be required to determine: Whether a particular paper is a "statement" (Campbell v. United States, supra; Palermo v. United States, 360 U.S. 343, 354–355, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959); United States v. Thomas, 282 F. 2d 191, 194 (2d Cir. 1960) and cases cited; United States v. Tomaiolo, 280 F.2d 411, 413 (2d Cir. 1960)); whether (where the record is not clear) statements exist in addition to those produced by the government (United States v. Chrisos, supra, 291 F.2d at 538); whether a statement once in existence is still in the possession of the government or has been destroyed. Killian v. United States, 368 U.S. 231, 240–241 (1961). In some circumstances it may be the duty of the court to call the agent even in the absence of a demand by defense counsel. United States v. Annunziato, 293 F.2d 373, 381 (2d Cir. 1961), cert. denied 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134.

1958, which had been delivered to defendant. The question of whether an otherwise producible statement is useful for impeachment must be left to the defendant.[42]

The government points out that Glass testified that so far as he could remember he had not seen a copy of the notes, and the defendant offered no evidence as to their form or content. Thus there was no showing that Glass "signed or otherwise adopted or approved" the notes, or that the notes were "a substantially verbatim recital" of his oral statements at the interview. Nor was there any affirmative evidence that the notes were still in existence. But to agree with the government's argument that the defendant must show, as a necessary foundation for a motion that the Court hear extrinsic evidence, that a "statement" producible under the Act is in fact in existence at the time of trial would be to hold that a hearing could not be had except on proof which, if available, would make the hearing unnecessary.

The facts which remained to be determined regarding the existence, form, and content of the notes were peculiarly within the knowledge of the government, and it was improper to impose the burden of a more precise demonstration upon the defendant.[43] The defendant did not participate in either the taking or the disposition of the notes. Even the witness can normally be of little assistance. At best he depends upon memory unaided by access to the records. He would not necessarily know whether his oral statement was recorded at the time, and is even less likely to know whether the recording was a "substantially verbatim recital" of his

oral statement. And of course the witness normally has no knowledge of the disposition of notes which may have been made by the interviewer.

In the presence of a prima facie showing of the prior existence of a producible statement it was also error for the Court to deny defendant's demand for further inquiry on the basis of the government's unsupported assertion that the notes were not available.[44] This is true for the same reason that it is inappropriate for the Court to allow the government to determine whether a writing is "substantially verbatim," or "contemporaneously recorded," or "signed, or otherwise adopted or approved" by the witness, or "relates to the subject matter as to which the witness has testified." To do so would be to permit the prosecution to make determinations which the Act requires the Court to make.[45]

The judgment will be vacated and the cause remanded to permit the trial court to conduct a hearing and consider such extrinsic evidence as may be necessary to enable the Court to determine whether the notes referred to by Glass constituted a "statement" within the meaning of the Act, and, if so, what became of them. A new trial will be required only if the Court after hearing concludes that a producible statement by Glass existed, and that the substantial rights of the defendant were affected by failure to make that statement available for defendant's use in the cross-examination of the witness.[46] Assuming that the trial court determines that a Jencks Act statement once existed, the Court may nonetheless conclude that the substantial rights of the defendant were not

42. Scales v. United States, 367 U.S. 203, 258, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961).

43. Campbell v. United States, 365 U.S. 85, 95–96, 81 S.Ct. 421, 5 L.Ed.2d 428 (1961).

44. Killian v. United States, 368 U.S. 231, 240–241, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).

45. United States v. Accardo, 298 F.2d 133, 138 (7th Cir. 1962); Bary v. United States, 292 F.2d 53, 57–58 (10th Cir. 1961); Holmes v. United States, 271 F.2d 635, 637 (4th Cir. 1959). But cf. Badon v. United States, 269 F.2d 75, 82 (5th Cir. 1959), cert. denied 361 U.S. 894, 80 S.Ct. 199, 4 L.Ed.2d 152.

46. This was the procedure employed in Killian v. United States, 368 U.S. 231, 241–244, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).

affected by its nonproduction if the same information was available to the defendant in the signed statement of March, 1958,[47] or if the statement was destroyed in accordance with normal practice before the prosecution of defendant was contemplated, for a sufficient reason wholly unrelated to the prosecution, in good faith and with no intention to suppress evidence.[48] If a new trial is denied, the District Court will enter a new final judgment thus preserving defendant's right to appellate review of the District Court's action.

A second statement, signed by Glass at Oklahoma City on September 12, 1955, was produced by the government during Glass's cross-examination at the present trial.[49] The statement was submitted to the Court for *in camera* excision of portions which did not relate to the subject matter of Glass's direct testimony.[50]

 After making the deletions which it considered appropriate, the trial court delivered the remainder of the September, 1955, statement to the defendant.[51] The Court properly declined to

47. Killian v. United States, 368 U.S. 231, 243–244, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961); Rosenberg v. United States, 360 U.S. 367, 370–371, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959); United States v. Thomas, 282 F.2d 191 (2d Cir. 1960); Karp v. United States, 277 F.2d 843, 849 (8th Cir. 1960), cert. denied 364 U.S. 842, 81 S.Ct. 80, 5 L.Ed.2d 65; compare Clancy v. United States, 365 U.S. 312, 315–316, 81 S.Ct. 645, 5 L.Ed.2d 574 (1961).

48. Killian v. United States, 368 U.S. 231, 242, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961); United States v. Greco, 298 F.2d 247, 249–250 (2d Cir. 1962). When a producible statement has been innocently destroyed the court may require the government to furnish the *information* contained in the destroyed statement from a source which would not otherwise be subject to discovery. See United States v. Annunziato, 293 F.2d 373, 382 (2d Cir. 1961), cert. denied 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134; United States v. Thomas, 282 F.2d 191 (2d Cir. 1960).

49. On cross-examination of Glass at the first trial regarding the Mill Valley statement of March 28, 1958, Glass was asked whether he had had earlier interviews with the FBI, and replied that he had been interviewed once—at his Mill Valley home a week or ten days prior to the signing of the statement of March 28, 1958. Since it now appears that Glass was also interviewed by the FBI in Oklahoma City in connection with his statement of September 12, 1955, defendant asserts that Glass's testimony at the first trial *was perjurious*, and that the government knowingly used this perjured testimony. The suggestion is patently groundless. It is clear from the face of the record that Glass understood the question put to him at the first trial to relate only to previous interviews in connection with the statement of March 28, 1958.

On the other hand, we are bound to say that the justification advanced by the government for failing to produce the statement of September 12, 1955, at the first trial is less than satisfactory. That paper admittedly contained a detailed "statement" by an important government witness to which defendant was clearly entitled under the Jencks Act. It was in the possession of the government attorney in the courtroom when Glass completed *his direct testimony. The defense* had made repeated demands for Jencks Act statements prior to and during the trial. Yet this statement was not produced because "at that particular instant" defense counsel did not formally "move under the Jencks statute, which he is required to do. * * *" The government knew of the existence of the statement, but *the defendant did not*, and the government knew that he did not. The rights of the defendant under the Act were lost through inadvertence though no possible interest of the government could be served, since the statement was admittedly subject to production. Imposing upon the defendant the responsibility for properly alerting the Court to his Jencks Act demands places the risk of *inadvertence* where it belongs; but there could be no justification for converting this rule of practical trial procedure into a trap for the defendant. We are happy to note that at the second trial government counsel volunteered the 1955 statement at the appropriate time without waiting to see whether defense counsel would discover *its existence and request it.*

50. 18 U.S.C.A. § 3500(c).

51. The recess which the Court in the exercise of its discretion (18 U.S.C.A. § 3500(c)) granted to defendant to examine the statement was short, but in all the

permit the defense to examine the entire statement "in order to argue whether it should be allowed to see" it. Palermo v. United States, 360 U.S. 343, 354, 79 S.Ct. 1217, 3 L.Ed.2d 1287 (1959). The entire text of the original statement under seal, as well as the excerpts, was transmitted with the record on appeal. Defendant properly preserved a necessarily "blind" objection to the excisions from the statement.[52]

At one point in the record the trial court stated that it had "eliminated certain portions [of the statement] which it felt were of a confidential nature for the Federal Bureau of Investigation * * *." This, if true, would have been error.[53] The sole basis upon which the trial court may excise portions of a producible statement is that they "do not relate to the subject matter of the testimony of the witness."[54] However, a careful comparison of the excised portions of the statement with Glass's direct testimony indicates that nothing properly producible was excised on the ground stated. We also note that a considerable part of the material which was passed to the defendant might properly have been withheld as relating not to the subject matter of Glass's direct testimony, but rather to the witness's general background and personal history.

Finally, however, we conclude that the trial court did erroneously excise four portions of the statement. Two of the withheld portions concerned the clarity of Glass's recollection of the events to which he testified.[55] Such material "certainly 'relates to the subject matter as to which the witness has testified' and should have been given to defendant." Rosenberg v. United States, 360 U.S. 367, 370, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959). The third omission was a summation by the witness of the general relationship of the witness and his wife to Communism.[56] The fourth omission

circumstances we cannot say that it was so unreasonably short as to constitute an abuse of discretion.

52. The requirement of the Act that it appear that the defendant "objects to such withholding" seems "a meaningless formality." 56 Mich.L.Rev. 314, 315, n. 11 (1957).

53. West v. United States, 274 F.2d 885, 890 (6th Cir. 1960), cert. denied 365 U.S. 819, 81 S.Ct. 688, 5 L.Ed.2d 691. See also 68 Yale L.J. 1409 (1959).

54. 18 U.S.C.A. § 3500(c).

55. The first omitted portion reads as follows:
"In all the foregoing background material and in all the material which follows, dates, places, and persons are recalled to the best of my recollection, but I will not swear as to the absolute accuracy of any particular data. Much of what has happened—the time, place, and people involved—has become vague in my memory because it has become unimportant to me. The word, unimportant, perhaps requires clarification. Ideas change, opinions and attitudes are modified, one matures—or one should—and it is sometimes a slow process * * * sometimes it is a fast one—in my case, I would say that it has been rapid * * * occurring in the last seven years—it is not complete, of course—and very possibly will not be complete, but many past events have become unimportant to me because the ideas, attitudes, opinions, etc., which contributed to a given situation or event are no longer valid to me or to my aims or goals. It follows, I think, that the people and exact times and places also assume an unimportance."
The second omitted portion reads:
"I attended the spring semester, then went on into the summer session, then with about 10 days between, entered the fall semester * * * for this reason events of this period have a tendency to blur in my recollection as to times, places, and people. I have tried to the best of my ability to sort matters out chronologically but, strange as it may seem to you, I just don't remember details clearly, and that is true of other times and places as well. However, to the very best of my recollection I shall tell of my interest in marxism and those few people I knew and was briefly associated with at the University prior to my leaving for Mexico."

56. The third omission reads:
"I have been involved with communists. I have been involved with communist or marxist philosophy * * * BUT, I have NEVER been involved AS a communist, nor has my wife. * * * I am an anti-communist * * * and I know that I can say that my wife is an anti-communist. * * *"

was a brief mention of an individual on the University campus within the relevant period who claimed to be, variously, an FBI agent and a member of the Communist Party and who "approached" the defendant, and "hung about" him.[57] The latter two portions of the statement were relevant to the subject matter of the cross-examination only in the broadest terms, but the test to be applied is not whether the material would be "relevant" in the evidentiary sense, but only whether it relates generally to the events and activities testified to.[58] The problem is not whether a question framed precisely in the terms of the withheld information would relate to the subject matter of the direct examination, but rather whether the withheld material might be useful in framing questions which would be relevant to that subject matter. The appropriate analogy is found in Rule 16 of the Federal Rules of Criminal Procedure, and the proper inquiry is whether the omitted portions of the statement "may be material to the preparation" of proper cross-examination. Doubts are to be resolved in favor of disclosure, for the Court necessarily proceeds without the benefit of counsel's more intimate knowledge of the possible significance of particular information for purposes of impeachment. Applying these standards, the witness's testimony that he had signed Communist Party membership cards on behalf of himself and his wife made relevant the third excerpt pertaining to the general relationship of the witness and his wife to Communism. Glass's testimony linking the defendant with this incident entitled defendant to the fourth excerpt describing a relationship between defendant and a self-avowed Communist in the same general period and locale.

The deletion of these four portions of the statement was error. However, as we have seen, the harmless error rule is applicable to failures to accord defendant the discovery provided by the Jencks Act, and we are not to reverse unless the "substantial rights" of the defendant have been affected. Here, essentially the same information contained in the first two omissions was available to the defendant in portions of the statement which were delivered to him,[59] and in defendant's testimony on cross-examination.[60] The same is true of the third

57. The fourth omission reads:
"During the fall semester there came to the University a man named Feldman * * * a psychiatric case, who, at one time claimed to be an FBI agent, another time, to be a member of the Communist party. He approached Maurice O.—and I've never been certain how * * * but came to our apartment with others at least once, perhaps twice. I had nothing to do with the fellow, but he apparently hung about Maurice and some others. I heard later, that he had threatened an instructor with a knife, had been placed under observation, and dismissed from school. I presume he went back to, I think it was, New York."

58. Jencks v. United States, 353 U.S. 657, 668–669, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957). See also 67 Yale L.J. 674, 687, 694–695 (1958).

59. In the extracts from the statement which were delivered to the defendant there were repeated expressions indicating the witness's lack of recollection: "As best I can remember. * * *, "I think it was. * * *", "There were

quite a few people there and I do not remember any of them * * *", "I do not remember * * *", "I am vague on this point * * *", "I cannot remember any specific one or any particular date, or who attended," "I really can't say when it was," "I cannot swear as to who was there," "I forget just when or where," "It is extremely difficult to keep things in order, chronologically or otherwise."

60. On cross-examination Glass repeatedly answered questions by stating that he could not remember. The quality of Glass's memory was the subject of specific, searching attack. He testified that he had read the transcript of the first trial and his copy of his statement of September 12, 1955, to refresh his recollection before his present testimony. He further testified: "Many things I cannot recall. It has been a very long time ago. Much of it I wish to put in the past and I don't care to remember." He explained that he had consulted his wife in preparing the statement of September 12, 1955, "Because my memory wasn't very clear, I couldn't recollect a lot of

omission.[61] As we have noted, the availability of the same information from another source is said to render harmless the erroneous failure to produce the whole of a Jencks Act statement,[62] and there is no reason to apply a different rule to the erroneous failure to deliver portions of such a statement. So far as this record discloses, the information contained in the fourth omission was not available to the defendant from any other source. However, although the information in this excerpt was broadly relevant to the subject matter of the direct examination, there is nothing in the record to indicate that the information was of any real consequence. We have examined what was produced and what was withheld in all four of the erroneous excisions in the context of the whole record, and our "conviction is sure that the error did not influence the jury, or had but very slight effect * * *." Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). It was therefore harmless.

4. *Mrs. Hunt* testified that she was a member of the Communist Party from February to June, 1949, and that during this period defendant was present at between five and ten "closed" meetings of the Communist Party, and lectured on "Marxist theory" at a series of about ten "orientation meetings" attended by members and "potential members" of the Party.

Defendant argues that the Court should have undertaken an inquiry to determine whether "statements" by Mrs. Hunt were available, other than the thirteen which were produced by the government at the first trial. In some circumstances such an inquiry may be appropriate;[63] but here there was neither sufficient indication that such statements might have existed,[64] nor any request by the defendant for further inquiry.

## III

The defendant demanded access to the grand jury transcript.[65] He made

---

things. Many things I asked her about." Although stating that he thought his memory was "above average," he testified that "this entire era or period of my life I have tried to suppress. I haven't particularly wanted to remember it. These people are no longer important to me. And things that are unimportant to one, one has a tendency not to remember, or to forget"; and, specifically, that the defendant and all of the incidents on the Oklahoma University campus were among the things which he wished to suppress and to forget.

61. Among other relevant portions of the the statement of September, 1955, which were delivered to defendant was this concluding paragraph:
"Neither I nor my wife are communists, nor do we ever consider ourselves to have been communists, nor do we ever intend to become communists. We are anti-communist."
Glass's equivocal relationship to Communism and the Communist Party, both objective and subjective, was exhaustingly explored on cross-examination.

62. See n. 47, supra, and related text.

63. See n. 41, supra.

64. Mrs. Hunt testified that she had reported to the FBI regarding the events relating to defendant as they occurred. At the first trial the government produced a full typewritten statement signed by Mrs. Hunt on April 3, 1958, eight short typewritten reports to the FBI regarding her observations, signed "Bill," dated in August and September, 1949, and four sets of undated handwritten notes apparently transmitted to the FBI with the typed reports. On cross-examination in the present trial, Mrs. Hunt responded affirmatively when asked, "Now this April 3, 1958, statement, it was a sort of pulling together of all the other statements, oral and written, you had given the FBI, is that correct?" Despite defendant's earnest argument, this exchange, to us, carries no suggestion that "statements" other than those produced had ever existed. Compare United States v. Kelly, 269 F.2d 448, 452 (10th Cir. 1959), cert. denied 362 U.S. 904, 80 S.Ct. 615, 4 L.Ed.2d 555.

65. The grand jury transcript is not a "statement" within the meaning of the Jencks Act. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 398, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959).

no showing of a "particularized need" [66] beyond an expression of hope that the transcript might contain material useful in the impeachment of government witnesses. There was no request that the Court examine the grand jury transcript for possible inconsistencies with the testimony of the same witnesses at trial. Indeed, there was no showing that the trial witnesses testified before the grand jury. In these circumstances, we have no occasion to determine whether we should adopt the rule of the Second Circuit that upon such a showing the trial court, if requested by the defendant, should examine the grand jury transcript and grant defendant access to such portions of it, if any, as contain testimony which is inconsistent with the witness's testimony on trial.[67]

## IV

■■■ Defendant argues that the evidence was insufficient to establish that his denial of Communist Party membership or affiliation was false. A determination of the truth or falsity of defendant's statement rested ultimately upon an evaluation of the credibility of the witnesses—including the defendant. The jury decided against defendant, and the jury's determination is beyond our power· to review unless the testimony which it chose to believe was "incredible as a matter of law." Bryson v. United States, 238 F.2d 657, 662 (9th Cir. 1956), cert. denied 355 U.S. 817, 78 S.Ct. 20, 2 L.Ed.2d 34. It was not.

■■■ Defendant also urges that the evidence failed to meet the standards of Opper v. United States, 348 U.S. 84, 91–92, 75 S.Ct. 158, 99 L.Ed. 101 (1954), and Smith v. United States, 348 U.S. 147, 154–155, 75 S.Ct. 194, 99 L.Ed. 192 (1954), requiring corroboration of a defendant's admissions. We need not spell out the circumstances corroborating defendant's admissions in this case for the rule applies only to admissions made after the commission of the offense.[68] Here, the offense was not defendant's relationship with the Communist Party but his false denial of that relationship, and the case against him did not depend in any part upon subsequent admissions.

Assuming that his statement was false, defendant argues that the evidence failed to establish that he willfully caused it to be "made, used and filed" in a "matter within the jurisdiction of the Department of the Air Force," as alleged. He contends that neither he nor the responsible official of his employer requested that he be given access to classified information, and that the filing of his application for security clearance was not authorized because defendant had no "need to know" classified information as required by the regulations.

■■■ 18 U.S.C.A. § 1001 was intended to serve the vital public purpose of protecting governmental functions from frustration and distortion through deceptive practices, and it must not be construed as if its object were narrow and technical.[69] It is immaterial that the filing of the Certificate of Non-affiliation may not have been required by Air Force regulations in the particular cir-

66. See United States v. Procter & Gamble Co., 356 U.S. 677, 683, 78 S.Ct. 983, 2 L. Ed.2d 1077 (1958); Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 400, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959).

67. Compare United States v. Annunziato, 293 F.2d 373, 382–383 (2d Cir. 1961), cert. denied 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134, and United States v. Giampa, 290 F.2d 83, 85 (2d Cir. 1961), and cases there cited, with Bary v. United States, 292 F.2d 53, 56 (10th Cir. 1961). The question was reserved in Rios v. United States, 256 F.2d 173, 178 (9th Cir., 1958), vacated on other grounds

364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688. See Nw.U.L.Rev. 482, 497–501 (1960).

68. See Warszower v. United States, 312 U.S. 342, 347, 61 S.Ct. 603, 85 L.Ed. 876 (1941); Bryson v. United States, 238 F. 2d 657, 662, n. 6 (9th Cir. 1956), cert. denied 355 U.S. 817, 78 S.Ct. 20, 2 L.Ed. 2d 34.

69. See United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 85 L.Ed. 598 (1941); Pitts v. United States, 263 F.2d 353, 358 (9th Cir. 1959), cert. denied 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547.

cumstances,[70] that the need for clearance may not have been immediate,[71] or that the Department did not in fact rely upon the defendant's false statement to its injury.[72] A false statement is submitted in a matter within the jurisdiction of a department or agency within the meaning of 18 U.S.C.A. § 1001 if it relates to a matter as to which the Department had the power to act.[73] The Department of the Air Force had ample power to act with respect to access to classified defense information. It was no interloper here—its interest in the subject matter was official and immediate.

The Security Officer of the Paul Omohundro Company who witnessed defendant's signature to the Certificate of Non-affiliation died before trial. But there was ample circumstantial evidence that the defendant had knowingly participated in the submission of his application for security clearance, including the Certificate of Non-affiliation, to the government agency having jurisdiction. The Certificate of Non-affiliation and the Personnel Security Questionnaire to which it was attached had been signed by defendant and witnessed by the employer's Security Officer, whose function it was to transmit these documents to the Air Force. Printed recitations upon the face of these forms made it clear that they were to be submitted for the purpose of securing the employee access to classified information. The jury was entitled to conclude that the defendant, in completing his portion of the forms, must have known what would have been obvious to anyone else. Endorsements on the face of the completed forms, amplified by the testimony of Air Force personnel, established that the forms were in fact submitted to the Department of the Air Force through the normal channels, and processed on the basis of a determination by the Air Force that a security clearance was required for the defendant.

**V**

██ The defendant asserts that the Court erred in the instructions which it gave with respect to the meaning of "membership" and "affiliation" in the context of this case.

Defendant attacks the Court's "membership" instructions on the grounds that they did not require the government to prove (1) that defendant complied with

70. Statements volunteered to an agency respecting matters within its competence fall within 18 U.S.C.A. § 1001. Pitts v. United States, 263 F.2d 353, 358 (9th Cir. 1959), cert. denied 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547; Cohen v. United States, 201 F.2d 386, 391–392 (9th Cir. 1953), cert. denied 345 U.S. 951, 73 S.Ct. 864, 97 L.Ed. 1374; Marzani v. United States, 83 App.D.C. 78, 168 F.2d 133, 141–142 (1948), aff'd 335 U.S. 895, 69 S.Ct. 299, 93 L.Ed. 431, reaff'd 336 U.S. 922, 69 S.Ct. 513, 93 L.Ed. 1075. Cf. Knowles v. United States, 224 F.2d 168, 172 (10th Cir. 1955).

71. Pitts v. United States, 263 F.2d 353, 356–357 (9th Cir. 1959), cert. denied 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547. There was testimony that as a matter of Air Force policy, requests for security clearances in anticipation of future needs were permitted.

72. Brandow v. United States, 268 F.2d 559, 565 (9th Cir. 1959), quoting with approval from United States v. Quirk, 167 F.Supp. 462, 464 (E.D.Pa.1958), aff'd 266 F.2d 26 (3d Cir. 1959). See also Pitts v. United States, 263 F.2d 353, 356 (9th Cir. 1959), cert. denied 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547.

73. The term "jurisdiction" is not used in the Act in a technical sense. Gonzales v. United States, 286 F.2d 118, 123 (10th Cir. 1960), cert. denied 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190. See also Pitts v. United States, 263 F.2d 353, 357–358 (9th Cir. 1959), cert. denied 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547; Ebeling v. United States, 248 F.2d 429, 434 (8th Cir. 1957), cert. denied 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 261; United States v. Kenny, 236 F.2d 128, 130 (3d Cir. 1956), cert. denied 352 U.S. 894, 77 S.Ct. 133, 1 L.Ed.2d 87; United States v. Steiner Plastics Mfg. Co., 231 F.2d 149, 152 (2d Cir. 1956); United States v. Leviton, 193 F.2d 848, 851 (2d Cir. 1951), cert. denied 343 U.S. 946, 72 S.Ct. 860, 96 L.Ed. 1350; Nye & Nissen v. United States, 168 F.2d 846, 851 (9th Cir. 1948), aff'd 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919.

whatever formal, objective requirements for membership the Communist Party may have had, and (2) that at the time of his membership the Party had an unlawful objective with which the defendant knowingly cooperated. Killian v. United States, 368 U.S. 231, 246–249, 254, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961), decided while this appeal was pending, requires the rejection of both arguments.

Defendant seeks to distinguish the Killian case on the ground that the government was there excused from proving defendant's compliance with formal objective requirements for Communist Party membership only because evidence in the record showed that the Communist Party was a secret organization—and that there is no such showing here. We do not read the Killian decision as requiring specific proof of the clandestine character of the Party, but rather as referring to a fact of general knowledge. In any event, the record in this case contains evidence of the use of pseudonyms, the holding of "closed meetings," and other efforts at concealment.

On the other hand, we have concluded that the Court's instruction with respect to "affiliation" [74] did not adequately exclude from that term mere sympathy with the aims and objectives of the Party, nor set out with sufficient specificity the elements of actual relationship to an organization required to constitute "affiliation." The error was not prejudicial, however, because equal concurrent sentences were imposed on the two counts.[75] We notice it only because of the possibility of a new trial. Since the Killian decision has now made available an authoritatively approved instruction on this subject if it should be needed,[76] no useful purpose would be served by a detailed analysis of the instruction given here.[77]

## VI

■ Defendant suggests possible error, but no possible prejudice, in the use of the designation "Communist Party" in the indictment, rather than the phrase "Communist Party, U.S.A." found in the Certificate of Non-affiliation.[78]

Defendant asserts that the Court erred in failing to instruct the jury that the testimony of two witnesses, or of one witness plus independent corroboration, was necessary to prove the falsity of defendant's statements. We have recently reaffirmed our view that the "two wit-

74. The essence of the Court's instruction was contained in these four sentences:

"Affiliation—it would be less than membership. You may find the defendant guilty of affiliation and not guilty of membership. Affiliation must be more than a casual relationship or an intermittent cooperation. It must be a continuous course of conduct on a fairly permanent basis."

75. Hupman v. United States, 219 F.2d 243, 248 (6th Cir. 1955), cert. denied 349 U.S. 953, 75 S.Ct. 882, 99 L.Ed. 1278.

76. Killian v. United States, 368 U.S. 231, 254, n. 13, 82 S.Ct. 302, 7 L.Ed.2d 256 (1961).

77. While the instructions approved in the Killian decision defined the terms "membership" and "affiliation" for the purposes of an affidavit filed with the National Labor Relations Board pursuant to Section 9(h) of the Taft-Hartley Act, 29 U.S.C.A. § 159(h), there is no apparent reason for giving these words a narrower meaning in a questionnaire preliminary to an investigation for access to classified information. Compare the definition of "membership" in Communist Party of United States v. Subversive Activities Control Board, 367 U.S. 1, 55–56, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); Konigsberg v. State Bar of Cal., 366 U.S. 36, 46–47, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); Barenblatt v. United States, 360 U.S. 109, 130, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); Frasier v. United States, 267 F.2d 62, 65–66 (1st Cir. 1959), with the definition of "membership" in a statute making "membership" a crime: Scales v. United States, 367 U.S. 203, 222, 229–230, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961); Noto v. United States, 367 U.S. 290, 298–300, 81 S.Ct. 1517, 6 L.Ed. 2d 836 (1961).

78. See Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); Putnam v. United States, 162 U.S. 687, 690–691, 16 S.Ct. 923, 40 L. Ed. 1118 (1896). Compare Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

ness" rule applicable in perjury prosecutions does not apply to prosecutions under 18 U.S.C.A. § 1001.[79]

■ Defendant contends that the membership and affiliation are mutually exclusive concepts as applied to one person's relationship with a single organization at the same time, that the verdicts are therefore repugnant, and that the government should have been required to elect between the counts. The argument has been made and rejected before.[80] Since the defendant received equal concurrent sentences on the two counts, we need only hold, as we do, that there was no error in submitting both counts to the jury. If two offenses were charged they were properly joined.[81] If a single offense was charged it was within the draftsman's discretion to charge it "in a variety of forms to avoid fatal variance of the evidence." United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 225, 73 S.Ct. 227, 97 L.Ed. 260 (1952). In either event the only "prejudice" suggested from the submission of both counts to the jury was that the government was afforded a widened range of permissible proof and alternate bases for conviction. In the circumstances of this case, there was no showing of possible prejudice which might have rendered the denial of a motion to compel an election an abuse of discretion.[82]

Defendant asserts that the two counts charged a single offense since the "false writing" which each count alleges the defendant to have "made, used and filed," is the same document. This Court has expressed serious doubts that two such counts could support consecutive sentences and we entertain them still, but in view of the equal concurrent sentences the question is not before us.[83]

There is no merit in defendant's contention that the Court abused its discretion in declining to permit him to examine a juror who asked a bailiff what was meant by the "Jencks case."

The judgment is vacated and the case remanded for further proceedings consistent with this opinion.

79. Neely v. United States, 300 F.2d 67 (9th Cir. 1962), and cases cited.

80. Sells v. United States, 262 F.2d 815, 824 (10th Cir. 1958), cert. denied 360 U.S. 913, 79 S.Ct. 1298, 3 L.Ed.2d 1262; Travis v. United States, 247 F.2d 130, 134–135 (10th Cir. 1957), reversed on other grounds, 364 U.S. 631, 81 S.Ct. 858, 5 L.Ed.2d 340.

81. Fed.R.Crim.P. 8(a).

82. See Fed.R.Crim.P. 14; Pierce v. United States, 160 U.S. 355, 356, 16 S.Ct. 321, 40 L.Ed. 454 (1896); Steinhardt Bros. & Co. v. United States, 191 F. 798, 799 (2d Cir. 1911); Terry v. United States, 120 F. 483, 484 (4th Cir. 1903).

83. Fisher v. United States, 231 F.2d 99, 103 (9th Cir. 1956). See also Sells v. United States, 262 F.2d 815, 824 (10th Cir. 1958), cert. denied 360 U.S. 913, 79 S.Ct. 1298, 3 L.Ed.2d 1262, and authorities cited.