Clair Daniel **PITTS**, Jr., Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 15799.

United States Court of Appeals
Ninth Circuit.

Jan. 27, 1959.

Rehearing Denied March 13, 1959.

■■■■■■■■■■ convicted of violating

■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■

Patrick E. Duggan, Monterey Park, Cal., for appellant.

Laughlin E. Waters, U. S. Atty., T. Conrad Judd, Robert John Jensen, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS, Chief Judge, and CHAMBERS and BARNES, Circuit Judges.

BARNES, Circuit Judge.

■■ Appellant here seeks a reversal of his conviction under count two of an indictment charging him with a violation of 18 U.S.C. § 1001. A two count indictment charging him with violations of this statute was filed on January 9, 1957. On May 16, 1957, the district court, sitting without a jury, found appellant guilty of the second count and acquitted him on the first count. Judgment was rendered on June 3, 1957, sentencing appellant to three years in prison. Jurisdiction of the district court was based on 18 U.S.C. § 3231. This Court has jurisdiction on appeal. 28 U.S.C. § 1291.

Section 1001 of 18 U.S.C. provides in material part:

> "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals

or covers up * * * a material fact, or makes any false, fictitious or fraudulent statements or representations * * * shall be fined not more than $10,000 or imprisoned not more than five years, or both."

The indictment's second count, of which appellant was found guilty, charged Pitts with knowingly making false and fraudulent statements and representations on a Personnel Security Questionnaire obtained for the Atomic Energy Commission [1] (hereinafter sometimes referred to as the AEC) by appellant's employer, Litton Industries, a corporation (hereinafter sometimes called Litton or the company).

On December 20, 1954, appellant was hired by Litton Industries in Los Angeles County, California, as a junior physicist under the name of Jack Lang. Although he was a radiobiologist, "Lang" apparently was given the job classification of junior physicist since Litton had no such job classification. During the time that he was employed by Litton, under a Dr. Clark who was his department head, his duties concerned work on and with a machine called the "Iso-X", which was a portable X-ray machine being developed by Litton for possible military and medical usage. All the work which appellant did was of a nonclassified nature.

Litton had a policy and practice of having all new employees complete an original Personnel Security Questionnaire at the time of employment or hiring, which was then kept in the employee's file until such time as it was needed. When needed, the original would be taken out, five or six copies would be typed, and the employee would then verify each one before a witness. The portion which the company was to complete (concerning "need to know" or justification for the requested clearance) was filled in, and the company then forwarded the document to the proper governmental agency. In appellant's case, the five or six copies were made up when he was hired and put in his file for later use.

Since Litton was constantly negotiating for various government contracts, it had a uniform policy of clearing all its technical personnel as soon as possible after they joined the company. This was so with junior physicists. The company apparently felt that they were aided in their negotiations with the government by having a "pool" of cleared personnel. Mr. Gray who was the administrative head of Department 24 in which Pitts worked in 1955, discovered that Pitts (known to him as Lang) did not have a security clearance, and directed that steps be taken to have him cleared. He determined that within the meaning of the various security regulations governing the classified projects on which Litton was working, that Pitts (using the name of Lang) was one of their "key personnel," and should be cleared. At the time that this occurred and during that same year, Litton was engaged in various projects for the Department of Defense which were classified. Also during that year, Gray engaged in various negotiations with certain government agencies including the Atomic Energy Commission, on subject matters which were of a classified nature. In August of 1955, Litton applied for an access permit which would have allowed Pitts' superior, Dr. Clark, to work in the AEC facilities in order that the company might obtain advance information concerning atomic energy matters which would have application in the fields in which Litton was interested in the event such classified information should be declassified and released to private industry for its use.

In October 1955, a Personnel Security Questionnaire bearing the heading of the

1. Count two read essentially as follows:
    On or about October 24, 1955, the appellant knowingly and wilfully made false and fraudulent statements and representations in a matter within the jurisdiction of the Atomic Energy Commission upon a Personel Security Questionnaire, to the effect that he had never been arrested, charged or convicted of any criminal offense except traffic violations; that he had never been refused clearance by any branch of the Federal Government.

AEC was filled out and certified to by appellant and submitted to the AEC. The AEC screened the application. A representative of the AEC appeared at the Litton Industries and was shown by appellant what his duties were with regard to radioactive isotopes.

On this Personnel Security Questionnaire, appellant stated that he had never been arrested, charged or convicted of any criminal offense except certain minor traffic violations. As a matter of truth he had been convicted on three prior occasions in the Parish of Orleans, Louisiana.[2] At least two of these convictions appear to be felonies.

Likewise, on the application, appellant stated as a brief description of his duties, the following:

"Physicist-Nuclear Electronics Department. Engaged in research, development and design of electronic items in the nuclear field."

In response to the question: "Will person have access to restricted data?", the box opposite "Yes" was checked "x".[3]

2. *Exhibit 3* was a certified copy of Information No. 142–751 "C", docket of the Criminal District Court for the Parish of Orleans, showing "Jack Lang, alais (sic) Paul R. Pitts" entered a plea of "guilty as charged" on August 19, 1953, to the charge of violation of LSA–Rev. Stat. 14:72, to-wit: forging "a certain instrument purporting to be a letter of recommendation from Stanford University, College of Medicine, and signed as purported maker thereof the signature of Harry A. Wilmer, M.D.," and was sentence to "Two (2) years in P.[arish] P.[rison], concurrently."
*Exhibit 3A* was a certified copy of Information No. 142–750 "A" of the same docket, showing the same "Jack Lang alais (sic) Paul R. Pitts" entered a guilty as charged plea to a similar violation, *i. e.*, forging the name of Harvey Hall, Registrar of the College of Medicine of Stanford University, and was sentenced to "Two (2) years in P.[arish] P.[rison]."
*Exhibit 3B* was a certified copy of Information No. 142–752 "B" of the same docket, charging "Jack Lang alias Paul R. Pitts" with impersonating a doctor of medicine, without authority; and in the second count thereof with performing acts purporting to be those of a doctor of medicine, contrary to the provisions of LSA–Rev.Stat. 14:112, to which counts there was entered the plea of "guilty as charged," and the defendant was sentenced to "Ninety (90) days in P.[arish] P.[rison], concurrently."
LSA–Rev.Stats. (1950), § 14:72 reads as follows:
"Forgery is the false making or altering, with intent to defraud, of any signature to, or any part of, any writing purporting to have legal efficacy.
"Issuing or transferring, with intent to defraud, a forged writing, known by the offender to be a forged writing, shall also constitute forgery.

"Whoever commits the crime of forgery shall be fined not more than five thousand dollars, or imprisoned, with or without hard labor, for not more than ten years, or both."
LSA–Rev.Stats. (1950), § 14:112 reads as follows:
"False personation is the performance of any of the following acts with the intent to injure or defraud, or to obtain or secure any special privilege or advantage:
"(1) Impersonating any public officer, or private individual having special authority by law to perform an act affecting the rights or interests of another, or the assuming, without authority, of any uniform or badge by which such officer or person is lawfully distinguished; or
"(2) Performing any act purporting to be official in such assumed character.
"Whoever commits the crime of false personation shall be fined not more than one houndred dollars, or imprisoned for not more than ninety days, or both."

3. There is considerable conflict between the government brief and appellant's brief as to whether appellant could ever have actually participated in any AEC program since he was not really a physicist but a radiobiologist. The government contends that it was "contemplated that he [appellant] would assume some of the duties of the senior physicist by engaging in reactor technology work" under the terms of the application of the Access Permit made to the AEC, and that it was contemplated that he "may be promoted to senior physicist." On the other hand, appellant contends that he was never qualified to be a senior physicist, could not by training have done work on the AEC reactor program and never intended to do so. In fact, his superior Dr. Clark testified that he could "by no means" ever be classified as a senior physicist on the AEC program since he did not have the training. And

At no time was a clearance of any type issued by the AEC for the appellant.

Appellant presents five questions on this appeal. They are:

(1) Did the trial court properly acquit the appellant of count one of the indictment? (This was conceded by the government, and need not here be considered.)

(2) Was the statement of appellant, albeit false, a matter "within the jurisdiction" of the AEC within the meaning of 18 U.S.C. § 1001?

(3) Does the voluntary act of completing a government form by an individual or the fact that it is a "government form" constitute a "matter" within the jurisdiction of the AEC within the meaning of 18 U.S.C. § 1001?

(4) Can an employee go behind a representation made by his employer, to a government agency, on a government form, to establish, in fact, whether employer's representation had substance or was a "sham"?

(5) Did the trial court correctly interpret the law applicable to the violation alleged against appellant in count two of the indictment?

We think the issue can be reduced to one major contention: Can the admittedly false statements of appellant be considered a violation of § 1001 *as matters within the jurisdiction of a government agency* when the position of appellant, and his work, never required that he deal with classified material, and in order for him to have been in classified work the following events would have had to happen: (1) the company would have had to find some area in which to negotiate with the AEC concerning obtaining information looking toward a contract; (2) such negotiations would have had to materialize into a contract; (3) a contract would have had to be awarded; and (4) the contract would have had to have been such as to furnish classified information to the company and by it, to appellant. Appellant contends, since all this would have had to happen before any classified matter came into his hands, his application for clearance was not a matter within the jurisdiction of the AEC, especially since the company falsely or mistakenly indicated that he would be working on the AEC projects and might need to know about some of this classified material. In other words, appellant's counsel urges a *subjective* test must be applied here to determine if the matter of his application and security clearance was one within the jurisdiction of the AEC. If the employee would not conceivably in the near future have gained access to AEC classified matter, then he could not be within the jurisdiction of the AEC, under appellant's view.

Appellant's counsel states his theory in this manner: "Our theory is that the appellant was not within the prohibition of Title 18 U.S.C. § 1001 in December of 1954, or at any other time, because he was not an individual performing acts which Congress sought to control through the Department of Defense" as to count one, or through the Atomic Energy Commission as to count two.

Upon oral argument, appellant further crystalized his position by stating that if the Atomic Energy Act of 1954, 42 U.S.C.A. § 2011 et seq., and the regulations issued pursuant thereto, permit an employer to clear a *pool* of technical personnel and give them all security clearances, irrespective of whether their skills will ever be used in classified work, then and only then, could appellant's conviction be justified. It was appellant's position that such "pool clearance" did not bring members of that pool into contact with an agency of the United States, and thus within the jurisdiction of an agency of the United States, until the pool member

---

that he could not have materially contributed to any AEC program since he lacked the training for it. Dr. Clark never told Gray that he intended to use Lang (Pitts) on the AEC program in any

manner, or that appellant would work in restricted or classified matter. Appellant only knew of the AEC program in a general manner.

was actually assigned to work on classified information.

We cannot agree. It is undisputed that a false statement was made. It seems equally obvious that the statement was made knowingly and wilfully.[4] It was not made inadvertently.[5] Nor can there be any serious question as to the *materiality* of a failure to disclose a previous arrest for a felony. United States v. De Lorenzo, 2 Cir., 1945, 151 F.2d 122.

Was the statement made in a matter within the jurisdiction of an agency or department of the United States?

The form on which the wilfully false statement was made was an Atomic Energy Commission Personnel Security Questionnaire form (commonly called an AEC-PSQ). It was marked as such at the top of its first page. Clearance was sought to enable the applicant to secure classified information concerning atomic energy. There would be no purpose in the application were it not a preliminary to the divulgence of classified information concerning atomic energy, for nonclassified information on that subject would require no clearance.

The AEC has been created as a governmental agency authorized to act on behalf of the government of the United States.[6]

4. Pitts had had previous experience with such questionnaires. On this one, he initialled each and every answer including questions twenty-four and twenty-five. He signed it on October 24, 1955. He knew that his duties were described as "Physicist." Ten months before October 24, 1955, he had signed a Personnel Security Questionnaire addressed to the Department of Defense (Ex. 1) in which he had listed his discharge from the military service as "Honorable" (Ques. 23b). He knew it was not honorable, that it was "undesirable." Five months previously on May 17th, 1955, he had written the Air Adjutant General of the United States Air Force (Ex. 12). In this letter he stated:

"At this time it is imperative that I know of the outcome [of an application for review of discharge under the provisions of AFR 35–66] in that I have been advised that on April 29, 1955 the Security Office at Litton Industries sent a P.S.Q. to the Office of Naval Intelligence, requesting a clearance for me as a 'key physicist' in their Nuclear Electronics Division. Also, application is being made for me to have an 'L' clearance through the Atomic Energy Commission. At this time I am in a dual status: Associate Professor of Physics at this college, and a physicist at Litton Industries."

On August 11, 1955, he was advised:

"The evidence submitted reflects favorably on your character subsequent to discharge. However, it does not disprove the facts of record which caused your separation from the service."

5. Each applicant for security clearance was asked, after the form had been typed, to look the form over carefully, to make sure there were no errors or omissions, and to determine if there were any corrections.

6. Following are statutes which authorize the Atomic Energy Commission to act in this field:

Section 2201(b) of Title 42 U.S.C.A., gives the Commission authority to establish by rule or regulation the use and possession of nuclear material.

Section 2201(i) authorizes the Commission to provide regulations to protect Restricted Data, protect the security of the program, and national defense, and protect public health and property.

Section 2201(q) authorizes the Commission to pass regulations necessary to carry into effect purposes of the program.

10 CFR Sections 25.11 et seq., govern in part the use of classified material of the Commission.

Section 25.11 provides for an application for an Access Permit and sets forth information that must be furnished by the permittee.

Section 25.22 provides all Access Permits will authorize use of Restricted Data, subject to personnel security clearances.

Section 95.31 requires that no person (here the permittee, Litton Industries) who possesses classified material shall distribute such material to personnel not cleared to proper level.

Here, the company had applied for and had been granted an Access Permit, which permit was issued on August 15, 1955. The appellant executed his application for security clearance, the PSQ to the AEC, on October 24, 1955, after the company had been granted authority to receive restricted data under the Access Permit.

Litton Industries, on July 13, 1955, had applied for "Access to Information on Nuclear Reactor Technology" [7] and had agreed, on August 10, 1955, "to obtain agreements from all individuals who will have access under the Access Permit," to obey and conform to all applicable regulations and requirements of the Commission. In this application it had been represented that "All employees" of Litton Industries were cleared to a minimum degree of "Confidential." Access Permit No. 361 granted Litton Industries access to "Confidential" restricted data, *provided* the individual employee receiving the data obtained appropriate personnel security clearance. It was in the performance of this obligation, on the part of Litton Industries to see that personnel security clearance was obtained, that the AEC-PSQ was submitted to and answered by Pitts.

Pitts' work at Litton may well have been directed solely at the medical or health aspects of nuclear physics. But that fact does not determine whether the data with which he worked was, or was not, an integral part of "a matter within the jurisdiction of an * * * agency of the United States."

Appellant urges that his duties did not require access to restricted data. How could he know this without knowing what the restricted data was? As the government brief points out, the appellant had no knowledge of the contents of the Access Permit, the nature of the contemplated contracts, the work necessary under negotiations then under way. But he did know, when he signed, that he was asking clearance of a governmental agency which would permit him to work on classified projects.

We have heretofore stated that § 1001 cannot apply only to those persons who are required by some statute or regulation to make an application for clearance. Cohen v. United States, 9 Cir., 1953, 201 F.2d 386. There we held that the giving of false statements voluntarily to agents of the Treasury Department, regarding declarant's financial affairs, was a violation of § 1001.

It is clear that the congressional intent in using the broad language found in 18 U.S.C. § 1001 (formerly 18 U.S.C. § 80) was to protect the authorized functions of governmental departments and agencies from the perversions which might result from the deceptive practices proscribed. Its provision should not, and cannot, be construed narrowly to apply only to matters in which the government has some financial or proprietary interest. United States v. Gilliland, 1941, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598.

Terry v. United States, 8 Cir., 1942, 131 F.2d 40, 45, holds that the determination of whether the matter was within the jurisdiction of a government agency is a question for the courts to decide, on the basis of the legislative history of the agency and the terms of the statute creating the agency's powers. In the instant case the district court held that the regulation of the clearances was a matter within the jurisdiction of the AEC. We agree with that holding.

This same problem was considered by the district court in the Eastern District of New York in United States v. Giarraputo, 1956, 140 F.Supp. 831, 832. Although the facts are not identical, they closely resemble those found herein. The defendant there was indicted for a violation of the same statute, 18 U.S.C. § 1001; he answered the same question with a "no", when the truth was he had a criminal record. The questionnaire was addressed to the Department of Defense who had contracted with Fairchild Engine & Airplane Corporation, employer of Giarraputo. The latter did not deny the criminal record, but contended there was no direct relationship between him and the government or any governmental agency; that he submitted the questionnaire only to his employer and that consequently his signing was not a matter within the jurisdiction of any department or agency of the government.

---

**7.** Exhibit 5.

The district court judge disagreed with this contention and found Giarraputo guilty, saying:

"Fairchild had contracts with the Government for the development and manufacture of 'classified' military or naval arms. Executive Order 10104, issued February 1, 1950, 18 U.S.C. § 795 note, pursuant to sections 795 and 797 of Title 18 U.S. Code, defined military and naval installations which required protection against the dissemination of information relative thereto. Section 1(f) of that Executive Order included 'any commercial establishment engaged in the development or manufacture of classified military or naval arms, * * * aircraft, or vessels for the United States Army, Navy, or Air Force'. Clearly Fairchild was included in that category and, as such, was bound by the Industrial Security Regulations promulgated by the Department of Defense. (Government's Exhibit 4). It was pursuant to those regulations that the defendant was required to have security clearance if he were to be permitted to work on secret matters. The Government, in engaging contractors to manufacture guided missiles and other secret weapons for it, makes every possible effort to prevent access to them by employees who fail to meet its rigid requirements as to character and integrity. To do less would make a mockery of security clearance. There is no doubt as to the materiality of the falsification here charged.

"The questionnaire itself was headed 'Department of Defense, Personnel Security Questionnaire'. It contained a reference to Title 18 Section 1001, and a resume thereof, warning the employee of the consequences of a false statement therein. I believe that the defendant knew that the questionnaire was to be submitted to a governmental agency for investigation, and that the statement that he had never been arrested

was false. I believed Special Agent Murphy's testimony to the effect that the defendant admitted that he had falsified his answers because he had been refused employment on previous occasions when he had disclosed his criminal record.

\* \* \* \* \* \*

"In the instant case the regulations required Fairchild's employees to have security clearance in order to be permitted to work on secret material, and the Naval Inspector of Ordnance, Ford Instrument Company, Long Island City, New York, was given security jurisdiction over Fairchild. (See Government's Exhibit 3.) That agency of the Government, through Naval Intelligence, had jurisdiction over security clearance for Fairchild's employees. Fairchild could not grant such clearance. It could be granted only by an agency of the Government. As hereinabove stated, the questionnaire was headed 'Department of Defense Personnel Security Questionnaire' and the defendant must have known that it was to be submitted to the Government for action. While it is true, as defendant contends, that the Navy Department could not have *required* the defendant to answer the questions, it could have refused to permit him to work on secret material if he had failed to do so. His criminal liability arose when he voluntarily submitted the questionnaire, containing the false answers, to his employer, for submission to the appropriate governmental agency, in order to obtain clearance for work on and access to secret material.

"It is not necessary, in order to support the charge herein, that the defendant present the questionnaire directly to the agency involved. As was stated in United States v. Myers, D.C., 131 F.Supp. 525, at page 530,

" 'Giving the statute (Title 18 U.S.C. § 1001) as it has been amend-

ed, modified and enlarged by the edict of Congress a literal, natural and common sense meaning, it is obvious that there is no requirement that the false document be *presented to* an agency or department of the United States. The only requirement is that the false document shall be made in a matter *within the jurisdiction* of such a department or agency of the United States.' (Matter in parenthesis added.)." Giarraputo, at pages 832–834.

 The appellant, with knowledge of his three previous convictions, could have refused to submit an application for AEC clearance that could *only* be granted by an agency of the government. He was under no compulsion to sign, except as he might think it would aid and promote him on his job. Having voluntarily and knowingly taken the chance of discovery of his false answers, he brought himself within the prohibitions of the statute.

The judgment of conviction is affirmed.