**Harold FRIEDMAN, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 18245.

United States Court of Appeals
Eighth Circuit.

March 16, 1967.

Register, District Judge, dissented.

Burnett Schwartz, St. Louis, Mo., for appellant. Louis Gilden, St. Louis, Mo., with him on the brief.

William C. Martin, Asst. U. S. Atty., St. Louis, Mo., for appellee. Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., with him on the brief.

Before VAN OOSTERHOUT and GIBSON, Circuit Judges, and REGISTER, District Judge.

FLOYD R. GIBSON, Circuit Judge.

Appellant, Harold Friedman, was convicted on a one-count indictment charging a violation of Title 18, § 1001 of the United States Code, which provides:

"Whoever, *in any matter within the jurisdiction of any department or agency of the United States* knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or *makes any false, fictitious or fraudulent statements or representations,* * * * shall be fined not more than $10,000 or imprisoned not more than five years, or both." (Emphasis supplied.)

The indictment charges that appellant " * * * wilfully and knowingly did make a false, fictitious and fraudulent statement and representation as to material facts in a matter within the jurisdiction of the Federal Bureau of Investigation, an agency of the United States, in that a written statement given and submitted to the said Federal Bureau of Investigation stated and represented in substance that on November 7, 1964, while in the custody of the Missouri State Highway Patrol and while handcuffed, he [appellant] was struck, beaten, saulted, and severely injured by Lieutenant C. V. Maxey, * * * in the Troop C headquarters of the Missouri Highway Patrol, whereas in truth and fact as he well knew, he was not struck, beaten, assaulted or severely injured or wounded * * *."

The facts show that defendant, together with his lawyer, voluntarily went to the office of the F.B.I. in St. Louis for the purpose of complaining about alleged mistreatment by Lt. Maxey, an officer of the arresting agency, while being held incidental to the arrest on a state charge. Defendant's purpose in making such complaint was to initiate a federal prosecution under the Civil Rights Laws and to induce the F.B.I. to investigate his charges against Lt. Maxey. During the course of a lengthy visit with two agents of the F.B.I. at the F.B.I.'s office and in the presence of his lawyer, defendant made an oral statement following which a typewritten statement was prepared by the agents and signed by defendant Friedman. Following investigation by the agents, it was determined by the F.B.I. that the statement made by Friedman with regard to his being " * * * struck, beaten, assaulted, and severely injured and wounded by Lt. Maxey * * * " was false. It is noteworthy, however, that after Friedman had been taken into custody by state officials, Lt. Maxey admitted that he had scuffled with Friedman while he was in custody on two occasions, each lasting about one and one-half minutes, and that Friedman admittedly had some small, observable injuries. Nonetheless, the instant prosecution was instituted in the United States District Court for the Eastern District of Missouri. The primary factual issue was the truthfulness of Friedman's statement. Each side presented relevant evidence on this issue. The jury resolved the issue by finding Friedman guilty as charged on the indictment and he timely appeals the conviction resulting from that verdict.

The dispositive question before us is whether a violation of 18 U.S.C. § 1001 is alleged in the indictment. This question is resolved by determining if the giving of false information to the F.B.I. relative to a violation of the criminal law is a "matter within the jurisdiction of any department or agency of the [government]." There is no doubt that the F.B.I. is an agency of the United States Government. However, appellant contends that the "jurisdiction" of the F.B.I. to investigate crimes against the United States is not the "jurisdiction" envis-

ioned by § 1001. We agree with that contention.

■ The proper examination of this statute must begin by viewing the historical circumstances in which it was cast. During the economic collapse of the 1930's the government, at an accelerated pace, began entering the field of economic reform and regulation. Jurisdiction over various parts of our economy was being delegated to innumerable federal agencies. For a proper functioning of their regulative and reform power these agencies depended upon information supplied by the individuals and corporations with which they were dealing. The giving of false information to these agencies would, of course, seriously pervert their functions, making effective regulations impossible. However, a fatal defect in the existing law made punishment of such fraudulent activity very difficult. The forerunner of the present § 1001 proscribed the making of false pecuniary claims against the Government, but not the supplying of false information. In 1934, largely at the request of the Secretary of the Interior to regulate "hot oil" shipments, the defect was remedied when Congress amended the statute to substantially its present form. Obviously, the immediate and primary purpose in amending the old "fraudulent claims" statute was to curtail the flow of false information to the newly created regulative agencies. Though the statute was drafted in broad inclusive terms, presumably due to the numerous agencies and the wide variety of information needed, there is nothing to indicate that Congress intended this statute to have application substantially beyond the purposes for which it was created.

■ The Government argues that the purpose of § 1001 is to protect agencies from being the victim of false information that has the tendency and effect of perverting normal and proper agency function. Since this false statement could interfere with the F.B.I. in their investigation, the Government contends the making of the false statement constitutes an offense. Though the giving of false information might have the effect of causing needless investigation, it does not pervert the agency's functions as envisioned by the purposes of the statute. The F.B.I. was only empowered to investigate the claim. This mere investigation of the claim caused no real corruption of its authorized activities.

■ Regardless of the history of the statute, the Government is asking us to attach a very literal interpretation of the Statute and apply it in a context not envisioned by the drafters. This we hesitate to do. A literal application of this statute can reach patently absurd results. As well phrased by Chief Justice Hughes in Sorrells v. United States, 287 U.S. 435, at 450, 53 S.Ct. 210, at 216, 77 L.Ed. 413 (1932): "To construe statutes so as to avoid absurd or glaringly unjust results, foreign to the legislative purpose, is, as we have seen, a traditional and appropriate function of the courts. * * *" As this statute carries a penalty exceeding the penalty for perjury,[1] if we were to give it the literal interpretation urged by the Government we would be saying that Congress considered it more serious for one to informally volunteer an untrue statement to an F.B.I. agent than to relate the same story under oath before a court of law. Certainly, Congress intended no such result. In fact, if we adopt a literal application of this statute, anything more than a casual social conversation with a Government employee would, without warning, subject the speaker to the possibility of severe criminal punishment. This is a formidable, indeed a dangerous, power the Government assumes the statute invests in law enforcement officials. We cannot blithely assume that Congress granted such a sweeping power. It is our position that such a formidable police authority must be clearly authorized. It

---

1. 18 U.S.C. § 1621 provides for a fine not more than $2,000 or imprisonment not more than five years, or both. While § 1001 of T.18 provides for a fine of not more than $10,000 or imprisonment of not more than five years, or both.

will not be assumed to exist. If the Congress wanted unsworn statements to investigative officials to serve as the basis for severe criminal punishment, we think it would have said so in clear, direct and positive terms.

■ Finally, we note that a literal application of the statute would completely remove the necessity for taking oaths. The numerous statutes authorizing investigative agencies to administer oaths would be rendered useless. Since the Judiciary is an agency of the United States Government, a strict application of this statute would remove the time-honored and now necessary formality of requiring witnesses to testify under oath. We simply cannot believe that Congress intended to supplant the existing perjury statutes and destroy the protections they afford. A literal interpretation of a statute will not be resorted to when it brings about absurd consequences or produces results not intended by Congress. Sorrells v. United States, supra, p. 446 of 287 U.S. 435, 53 S.Ct. 210 (1932).

On facts very similar to the ones before us, Circuit Judge Pickett, in United States v. Levin, 133 F.Supp. 88, 90 (D. Colo.1953), reasoned:

"If the statute is to be construed as contended for here by the United States, the results would be far-reaching. The age-old conception of the crime of perjury would be gone. * * * Any person who failed to tell the truth to the myriad of government investigators and representatives about any matter, regardless of how trivial, whether civil or criminal, which was within the jurisdiction of a department or agency of the United States, would be guilty of a crime punishable with greater severity than that of perjury. * * * It is inconceivable that Congress had any such intent when this portion of the statute was enacted."

■ It is, therefore, our conclusion that this statute should not be given a broad literal interpretation to be applied in all areas of our national life. Such an interpretation was not envisioned by the enactment, reaches patently absurd results, and is fundamentally dangerous. This statute must have some effective limitation.

Having concluded this much, the problem now is defining the proper limits of the statute. As applied to this case, we believe the answer lies in the definition of the word, "jurisdiction." Jurisdiction is a word of many meanings. See, 50 C.J.S., p. 1089, et seq. In determining the meaning of jurisdiction under § 1001, .Gonzales v. United States, 286 F.2d 118 (10 Cir. 1960) defined it as follows: "Jurisdiction means the right to say and the power to act."

In discussing jurisdiction, we must recognize the fundamental difference between the naked authority of a body to act and the power to make final or binding determinations. On one hand there exists a power to make monetary awards, grant governmental privileges, or promulgate binding administrative and regulative determinations. From this "jurisdiction" indicating a positive power, we must differentiate the mere authority to conduct an investigation in a given area without the power to dispose of the problems or compel action. In viewing § 1001, the Court in United States v. Stark, 131 F.Supp. 190, 206–207 (D.Md.1955) clearly pointed out this distinction:

"Heretofore I have decided that the FBI did have power and authority to investigate the subject of the confidential communications to it relating to alleged bribery or attempts to bribe an Inspector of the Federal Housing Administration. However, there is a clear distinction between the power to investigate and the jurisdiction or authority to decide and act upon a particular subject matter. See, United States v. White, D.C., 69 F.Supp. 562, 564 and Carroll Vocational Institute v. United States, 5 Cir., 211 F.2d 539, supra. * * * In like manner the important functions of the Department of Justice with respect to criminal offenses against the United States is the power to investigate and initiate prose-

cutions, but not the power to decide whether a criminal offense has been committed. In this respect its functions are quite different from those of the Secretary of the Treasury with respect to the payment of claims against the United States, or the authority of many other agencies with respect to various governmental matters. I therefore conclude that in the particular situation here presented, the matter was not within the jurisdiction of the FBI or the Department of Justice within the meaning of that phrase as contained in section 1001."

■ We consider the foregoing reasoning to be sound and applicable to this case. The F.B.I. had authority to investigate, and in that broad sense it had "jurisdiction." However, it had no power to adjudicate rights, establish binding regulations, compel the action or finally dispose of the problem giving rise to the inquiry. In this restrictive sense, the investigation of a possible violation of the criminal law is not a matter over which the F.B.I. exercises "jurisdiction." It is in this more restrictive sense, we believe Congress intended to use the word "jurisdiction" in determining violations of § 1001.

We believe the total view of the case law in this area supports our position. A reading of the cases indicates that the vast majority fall into one of the following classifications: (1) Giving of false information with the purpose of receiving a monetary or proprietary benefit. United States v. Bramblett, 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955); De Casaus v. United States, 250 F.2d 150 (9 Cir. 1957); Ebeling v. United States, 248 F.2d 429 (8 Cir. 1957); United States v. Quirk, 167 F.Supp. 462 (E.D.Pa.1958); (2) The resisting of monetary claims by the United States by presentation of false information. United States v. McCue, 301 F.2d 452 (2 Cir. 1962); Neely v. United States, 300 F.2d 67 (9 Cir. 1962); Brandow v. United States, 268 F.2d 559 (9 Cir. 1959); Knowles v. United States, 224 F.2d 168 (10 Cir. 1955); Cohen v. United States, 201 F.2d 386 (9 Cir.

1953); (3) The seeking of some governmental privilege such as employment or security clearance on the basis of falsified information. Blake v. United States, 323 F.2d 245 (8 Cir. 1963); Ogden v. United States, 303 F.2d 724 (9 Cir. 1962); Alire v. United States, 313 F.2d 31 (10 Cir. 1962); Pitts v. United States, 263 F.2d 353 (9 Cir. 1959); Marzani v. United States, 83 U.S.App.D.C. 78, 168 F.2d 133 (1948); United States v. Giarraputo, 140 F.Supp. 831 (E.D. N.Y.1956); (4) The giving of false information which frustrates lawful regulation. United States v. Gilliland, 312 U.S. 86, 61 S.Ct. 518, 85 L.Ed. 598 (1941), (oil shipment reports to the Secretary of Interior); Brethauer v. United States, 333 F.2d 302 (8 Cir. 1964), (financial statements to Army post exchange); Gonzales v. United States, 286 F.2d 118 (10 Cir. 1960), (financial statement to R.E.A.); Rolland v. United States, 200 F.2d 678 (5 Cir. 1953), and United States v. Moore, 185 F.2d 92 (5 Cir. 1950), (employment statistics to Department of Labor); Terry v. United States, 131 F.2d 40 (8 Cir. 1942), (ownership statement to F.H.A.).

When we enter the area of the enforcement of the general criminal law and the investigations relative thereto, the courts have been reluctant to extend the literal wording of the statute beyond the four areas above enumerated. We are aware of five cases in which individuals have been prosecuted for giving false information to the F.B.I. relative to a violation of the law. Four of these cases refused to apply this statute to such a factual situation. Three cases based their decisions upon the fact that the F.B.I. initiated the investigation and the information received was merely in reply to direct questions. Such information was not considered to be a "statement" as set forth in the statute. Paternostro v. United States, 311 F.2d 298 (5 Cir. 1962), (quoting with approval United States v. Levin, supra); United States v. Davey, 155 F.Supp. 175 (S.D.N.Y. 1957); United States v. Stark, supra. The fourth, United States v. Levin, su-

pra, flatly refused to apply § 1001 to voluntary statements given to the F.B.I. during the investigation of a crime. Whatever their basis, we read these decisions as indicating a decided reluctance on the part of the courts to interpret § 1001 to cover the investigation of criminal conduct.

The single dissenting voice is from the District of Alaska. On facts somewhat similar to the ones at bar, the Court held in United States v. Van Valkenburg, 157 F.Supp. 599, 17 Alaska 450, that the statute was applicable. We are not persuaded by this case nor do we believe it represents the weight of authority in this area.

■■ No one would deny the Government's right under the statute to protect itself from fraudulent claims and from those who are seeking the grant of governmental privileges under false assertions. When the false statement is made to the agency with the power to allow the privilege or grant the award, jurisdiction of the agency is established so as to warrant a prosecution under § 1001. Likewise, if the Government is to regulate, it must be able to protect its regulative functions from those who would utterly destroy those functions by presenting false information. The statute was designed for this very purpose. If the agency has power to enact binding regulatory requirements and determine if and to what extent an individual comes within the regulatory proscriptions, this agency, too, has jurisdiction under § 1001. However, if no such positive power resides in the agency, the agency has no "jurisdiction" within the meaning and intent of § 1001. Consequently, this section has no application where a statement is given to the F.B.I. merely for the purpose of instigating an investigation into the possibility of a violation of the criminal law, as the F.B.I. has no power to dispose of the issue under investigation or regulate the activities of the person making the statement.

In reaching this decision we are influenced by the important social policy that is served by an open line of communication between the general public and law enforcement agencies. To preserve order, individuals must be given every encouragement to report suspected crimes to the police. To divert this free flow of information would allow more crimes to go undetected and criminals free to commit further depredations. To construe this statute to embrace individuals who volunteer unsworn information to the police, even though the information is proved false, we fear would to a degree dry up a prime source of truthful information. When the specter of criminal prosecution hangs over the head of every citizen who reports suspected violations, individuals will naturally hesitate, or even refuse, to provide vital information. They will fear that should their information appear to be false to the police they may be called upon to defend themselves in a criminal prosecution. Especially will this be true when the source of the information is persons of the lower educational and economic strata and those with criminal backgrounds.

■ For the reasons set out in this opinion, we believe that the indictment does not state a violation of 18 U.S.C. § 1001 when it charges giving false information to the F.B.I. relative to a violation of the criminal law. Since no crime is charged, appellant was entitled to a judgment of acquittal. Judgment of the District Court is reversed with instruction to dismiss the indictment. The other issues raised by appellant are rendered moot by this disposition and will not be discussed.

Judgment reversed.

REGISTER, District Judge (dissenting):

I respectfully dissent. Because of the nature of the issue involved in this case and the scope of the majority opinion, I desire to express my views in some detail.

As the statute involved and the charging portion of the indictment are quoted, and the essential facts are fairly stated in the majority opinion, they will not be here repeated.

While, in general, the language of the statute is clear and precise, certain words included therein have been subject to judicial interpretation. The offense defined is composed of specific elements. In United States v. McCue, 301 F.2d 452 (2 Cir. 1962), cert. den. 370 U.S. 939, 82 S.Ct. 1586, 8 L.Ed.2d 808, rehearing den. 374 U.S. 858, 83 S.Ct. 1860, 10 L.Ed. 2d 1083, referring to appellants' contention that Section 1001 was not applicable to the conduct for which they were convicted, the court stated, at page 454:

"Analysis of the Section reveals no ambiguity. The elements of the offense are 1) a statement, 2) falsity, 3) that the false statement be made 'knowingly and wilfully,' and 4) that the false statement he made in a 'matter within the jurisdiction of any department or agency of the United States.' (Citation.)"

It should be noted that the current weight of authority is that "materiality" of the statement is also an essential element of the offense, and that this is the law of this circuit. Brethauer v. United States, 333 F.2d 302, 306 (8 Cir. 1964).

In many of the cases referred to by the majority the critical issue (or one of the critical issues) involved the interpretation of the term "statement" as used in the statute. An excellent review of these cases and the applicable law is found in Paternostro v. United States, 311 F.2d 298 (5 Cir. 1962). The statement made by the appellant herein is not merely a negative response to a question put by a government agency, or an "exculpatory no"; it is a positive statement made to agents of the F.B.I. for the purpose of initiating a federal prosecution against Lt. Maxey under the Civil Rights laws of the United States. It is clear that the appellant's statement in this case is within the meaning of the term "statement" as used in Section 1001.

For purposes of this appeal, it has also been established that appellant's statement is false and was made "knowingly and willfully" although, as is pointed out by the majority, there is some evidence in the record to the contrary. This was

a question for the jury, and was determined adversely to the appellant. The most recent pronouncement of this court concerning the applicable rule, of which I am aware, may be found in Anderson v. United States, 369 F.2d 11 (8 Cir. December 2, 1966) and is therein stated as follows:

"The general rule must again be recognized that all evidence is to be viewed in a light most favorable to the government as the prevailing party and all reasonable inferences must similarly be resolved in its favor. (Citations.)"

The Court in Bryson v. United States, 238 F.2d 657 (9 Cir. 1956), cert. den. 355 U.S. 817, 78 S.Ct. 20, 2 L.Ed.2d 34, rehearing den. 355 U.S. 879, 78 S.Ct. 138, 2 L.Ed.2d 110, at page 662 stated:

"The weight of the evidence, including all factors of credibility which do not render the testimony incredible as a matter of law is beyond the scope of appellate review of jury verdicts."

Also see: Ogden v. United States, 303 F.2d 724, 742 (9 Cir. 1962).

This court in Brethauer, supra, 333 F. 2d at page 306, held that " * * * an essential element of the offense of making a false, fictitious or fraudulent statement proscribed by 18 U.S.C. Sec. 1001, is that such statement relates to a 'material fact'." Materiality of the alleged false statement was charged in the indictment in this case, and was an issue determined by the court. United States v. Ivey, 322 F.2d 523, 529 (4 Cir. 1963), cert. den. 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313; United States v. Parker, 244 F.2d 943, 950 (7 Cir. 1957), cert. den. 355 U.S. 836, 78 S.Ct. 61, 2 L.Ed.2d 48. The trial court, recognizing this principle, specifically instructed the jury concerning the materiality of appellant's statement.

And in Blake v. United States, 323 F.2d 245, 246 (8 Cir. 1963) this court said:

"In determining whether a false statement is material, the test is whether it 'has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in

making a determination required to be be made.' (Citations.)"

This statement was subsequently approved in Brethauer, supra. Also see: Freidus v. United States, 96 U.S.App. D.C. 133, 223 F.2d 598, 601 (1955), and Brandow v. United States, 268 F.2d 559, 564–565 (9 Cir. 1959). Tested by this criteria, it appears that the "materiality" of the allegedly false statement is beyond question; no exception was taken to the trial court's instruction concerning this matter.

We are in agreement that the F.B.I. is an "agency" of the United States government. For a detailed history of the creation and purpose of the Federal Bureau of Investigation, and for the proposition that it is within the definition of "agency" within the meaning of the statute, see United States v. Stark, 131 F.Supp. 190, 194 (D.C.Md.1955).

From the foregoing it is obvious that all of the essential elements of the statute are established in the instant case unless the "jurisdiction" of the F.B.I. to investigate crimes against the United States is not the "jurisdiction" envisioned by Section 1001. This must be determined by the interpretation placed on the word "jurisdiction", and the test by which we are bound is the Congressional intent.

Whether a matter is "within the jurisdiction" of a department or agency of the government, within the meaning of the statute is a question of law for determination by the court. The interpretation of that phrase must be made in the light of the legislative intent as it has been disclosed by the Acts of Congress. Terry v. United States, 131 F.2d 40, 44 (8 Cir. 1942); Pitts v. United States, 263 F.2d 353 (9 Cir. 1959), cert. den. 360 U.S. 935, 79 S.Ct. 1457, 3 L.Ed.2d 1547, rehearing den. 361 U.S. 857, 80 S.Ct. 47, 4 L.Ed.2d 97; and Gonzales v. United States, 286 F.2d 118, 123 (10 Cir. 1961), cert. den. 365 U.S. 878, 81 S.Ct. 1028, 6 L.Ed.2d 190.

While it is my understanding that there is no substantial disagreement concerning the interpretation of "statements" or "matter" or "department or agency" (as those terms are used in the statute), and their applicability to the facts herein present, I think it should clearly appear that a reversal must rest solely upon the interpretation of the word "jurisdiction", and believe that significance should be attached to the very broad interpretation uniformly placed upon those other words by the Courts and the reasoning of those courts in arriving at their conclusions—reasoning involving consideration and application of the same general principles here required for ascertaining congressional purpose and intent.

The majority refer to the legislative history of the statute and the circumstances under which the 1934 Amendment was passed and state:

> "Obviously, the immediate and primary purpose in amending the old 'fraudulent claims' statute was to curtail the flow of false information to the newly created regulative agencies. Though the statute was drafted in broad inclusive terms, presumably due to the numerous agencies and the wide variety of information needed, there is nothing to indicate that Congress intended this statute to have application substantially beyond the purposes for which it was created."

However, all courts do not agree with this conclusion. In McCue, supra, it was established that the defendants had voluntarily appeared before Treasury agents who were conducting an investigation concerning their income tax returns and, in the course of such examination, knowingly and willfully made certain false statements. On appeal, the defendants contended that Section 1001 was not applicable to the conduct for which they had been convicted. After stating the elements of the offense as hereinbefore quoted, the court said (301 F.2d, pp. 454, 455):

> "The legislative history does not suggest that the purpose of the amendment was in any way intended to be confined to the specific situations

which were mentioned. The very broad language of the amendment suggests that these situations were merely cited as examples of the kind of conduct which the statute was designed to prohibit. And the quite different character of the two examples which were given may also be taken as representing the broad application intended for the statute.

'A greater variety of false statements were meant to be included. There is no indication in either the committee reports or in the congressional debates that the scope of the statute was to be in any way restricted.' United States v. Bramblett, 348 U.S. 503, 507, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955).

"The main thrust of appellant's argument with respect to Section 1001 is that the Section is intended to protect the processes of government from interference and obstruction and not to require 'the citizen to speak truthfully to police officers.'

\*  \*  \*  \*  \*  \*

"The great weight of judicial authority supports the applicability of Section 1001 to the circumstances of the present case. The recent cases in which the Supreme Court has concerned itself with the Section contain no suggestion of confining the effect of the statute to any smaller area than that encompassed by its own broad language. On the contrary there are indications that the Court rejects any theory of narrow applicability."

The conclusion of the majority with respect to the purpose and scope of the statute, I believe, is much more limited and restricted than that stated by the Supreme Court in United States v. Gilliland et al., 312 U.S. 86, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941). In that case, at page 93, the Court stated that the apparent congressional intent in enacting what is now Section 1001 was to " \* \* \* protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." This

expression of congressional purpose has been adopted and restated on many subsequent occasions by various courts. See: United States v. Van Valkenburg, 157 F.Supp. 599, 600 (D.C.Alaska 1958); Cohen v. United States, 201 F.2d 386, 392 (9 Cir. 1953), cert. den. 345 U.S. 951, 73 S.Ct. 864, 97 L.Ed. 1374; Knowles v. United States, 224 F.2d 168, 171 (10 Cir. 1955); Pitts, supra, 263 F.2d p. 358; Gonzales, supra, p. 123; Ogden, supra, 303 F.2d p. 742; and Paternostro, supra, 311 F.2d p. 302.

Not only are all of the essential terms used in the statute common, well-understood words, but they are general and broad in meaning, and have been uniformly so interpreted by the courts, consistent with the congressional purpose as pronounced in *Gilliland*. Concerning the term "statement", there is no distinction between those made in writing and those made orally, United States v. Beacon Brass Co., Inc., et al., 344 U.S. 43, 73 S.Ct. 77, 97 L.Ed. 61 (1952) and *McCue*, supra, and cases therein cited, and includes both those made under oath, *McCue*, supra, and those which are unsworn, *Knowles*, supra. "Statements" are not limited to those required to be made by law or regulation, Neely v. United States, 300 F.2d 67, 93 A.L.R.2d 718 (9 Cir. 1962), cert. den. 369 U.S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84, and include those made to investigating officers, De Casaus v. United States, 250 F.2d 150 (9 Cir. 1957), cert. den. 356 U.S. 949, 78 S.Ct. 914, 2 L.Ed.2d 243. The language of the statute contains no restrictions concerning the person to whom the false statement need be made; in fact, the "statement" may come within the purview of the statute even though made to an individual not an agent or employee of the federal government. See: *Pitts,* supra; United States v. Giarraputo, 140 F.Supp. 831 (E.D.N.Y.1956); and Ebeling et al. v. United States, 248 F.2d 429, 434 (8 Cir. 1957), cert. den., Emerling v. U. S., 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 261. The "statements" need not have been relied upon by the "agency", and their purpose need not have

been accomplished. *Brandow,* supra; and *Blake,* supra.

With reference to the term "department" or "agency" within the meaning of Section 1001, the Supreme Court in United States v. Bramblett, 348 U.S. 503, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955), stated, at page 509:

> "The development, scope and purpose of the section shows that 'department,' as used in this context, was meant to describe the executive, legislative and judicial branches of the Government."

The only definitive limitation appearing in the statute is that the "matter" be "within the jurisdiction of" any department or agency of the United States.

The foregoing discussion illustrates, in my view, the very wide area and comprehensive circumstances to which the courts have held Section 1001 applicable, considering its legislative history, broad and unambiguous language, and its purpose as expressed in *Gilliland.*

The majority states that to interpret the statute as argued by the government would result in an absurdity, in that the penalty for its violation would be more severe than that for perjury. A similar argument was advanced in *Gilliland.* In that case it was argued that the penalty prescribed in Section 35 of the Criminal Code (which was amended by the 1934 Act) was greater than that fixed by a later Act—that of 1935—and that this variance was significant in its construction and application. The Court, in rejecting this contention, stated (312 U.S., p. 95, 61 S.Ct. p. 523):

> "The matter of penalties lay within the discretion of Congress. Section 35 covered a variety of offenses and the penalties prescribed were maximum penalties which gave a range for judicial sentences according to the circumstances and gravity of particular violations."

In this connection, also see United States v. Beacon Brass Co., Inc., supra.

The majority is of the opinion that the effect of an interpretation such as that argued for by the government would be to invest in law enforcement officials a formidable and dangerous power, and that "If the Congress wanted unsworn statements to investigative officials to serve as the basis for severe criminal punishment, we think it would have said so in clear, direct and positive terms." Nevertheless, the statements constituting the basis for the prosecutions and resulting convictions in many of the cited cases were "unsworn statements to investigative officials." See, by way of illustration: *Cohen, Knowles* and *Neely,* supra, wherein the unsworn statements were made to Internal Revenue agents engaged in investigations into tax matters. The prosecution in *De Casaus,* supra, was predicated upon the making of a false statement (oral and unsworn) to a special agent of the Commodity Credit Corporation during the course of an official investigation.

It is of interest to note that some investigative officers are empowered to administer oaths, but that the agents of the F.B.I. have no such authority except in certain specified areas. Title 5, U.S.C.A., Section 93. Internal Revenue agents have been so authorized by the provisions of Title 26, U.S.C.A. Section 7602.

After concluding that the statute must be construed in a limited sense, the majority determines the issue presented here (i. e., the limits of the statute as applied to the facts) by what is, in my view, an exceedingly narrow and restricted sense of the term "jurisdiction" as used in the Act. Conceding that "[j]urisdiction is a word of many meanings", the accepted definition is then quoted from *Gonzales*—"Jurisdiction means the right to say and the power to act"—and the majority then approves the reasoning of the court in *Stark,* supra, to the effect that: "In like manner the important functions of the Department of Justice with respect to criminal offenses against the United States is the power to investigate and initiate prosecutions, but not the power to decide whether a criminal offense has been committed." It is interesting to note that the writer of the

opinion in *Gonzales* is the same Judge who authored United States v. Levin, 133 F.Supp. 88 (D.C.Col.1953), in which the majority finds strong support. A careful reading of *Levin*, however, justifies, in my opinion, an understanding that the very basis and foundation of that opinion was the author's conviction that, to be within the purview of the statute, the "statement" had to be one given under a legal obligation to make or give the requested information. In fact, in Levin, at page 89, the author states: "No decision has been found which holds that the failure to tell the truth to an agent or representative of a department or agency of the United States by a person under no legal obligation to speak, is a violation of Section 1001." Subsequently, the courts have overwhelmingly rejected this position and specifically held that such failure does constitute a violation of the statute. See: *Cohen, Knowles* and *Neely*, supra.

In support of this restrictive definition, which would so drastically limit the otherwise broad, general and inclusive language of the Act, reliance is placed upon the "total view of the case law", and the reluctance of courts to go beyond four specified areas into which the vast majority of the cases involving Section 1001 have been placed. I agree with the categorization of the cases cited, insofar as the factual situations are concerned, but in my view the prudent and reasonable conclusion to draw is that these are the areas in which (human nature being what it is) the proscribed false statements would normally arise. I am not persuaded that such categorization logically supports the conclusion that the factual situation in this case is excluded from the purview of the statute.

In support of the majority's view that the courts generally have been reluctant to extend the reach of the statute beyond the four areas enumerated, three cases (*Paternostro* and *Stark*, supra, and United States v. Davey, 155 F.Supp. 175 (S.D. N.Y.1957)) are referred to as cases which " * * * based their decisions upon the fact that the F.B.I. initiated the investigation and the information received was merely in reply to direct questions.", and that "Such information was not considered to be a 'statement' as set forth in the statute." It is then stated that a fourth case Levin, supra, " * * * flatly refused to apply Sec. 1001 to voluntary statements given to the F.B.I. during the investigation of a crime." As previously shown, we are not here presented with any problem concerning the actual existence of a "statement." In *Levin* the false statement upon which the indictment was based consisted of an oral statement, not made under oath, to an F.B.I. agent during the course of an investigation. Without belaboring the point I point out that the court in the later case of *Brandow*, supra, stated, at 268 F.2d, page 564:

"United States v. Levin, * * * differs from the instant case, because there no sworn statement was involved. But see Marzani v. United States, supra. Regardless of any alleged factual differences, however, we decline to follow the reasoning of United States v. Levin, supra, or United States v. Stark, D.C.D.Md.1955, 131 F.Supp. 190, neither of which is binding on this Court. In reaching this conclusion, *we prefer the reasoning of the later case of* United States v. Van Valkenburg, D.C. D.Alaska 1958, 157 F.Supp. 599, as well as our earlier decisions herein cited, and our recent opinion of Pitts v. United States, 9 Cir., 1959, 263 F.2d 353." (Emphasis added.)

In United States v. Philippe, 173 F. Supp. 582 (S.D.N.Y.1959), the defendant was charged with a violation of Section 1001, and the false statement involved was "a negative exculpatory denial of a suspected source of income", made orally and under oath to a Special Agent of the Intelligence Division, Internal Revenue Service, during the course of the latter's investigation. The court therein concluded that the oral statement made by defendant did not constitute a "statement" within the meaning of the statute, but such conclusion was based upon the expressed premise that the false denials

did not in any way pervert the investigative functions of the Internal Revenue Service—a premise advanced, in principle, by the majority here.

The court in *Philippe* clearly considered its conclusion and reasoning to be consistent with and in accord with *Levin,* as it stated, at page 584:

> "There is persuasive authority supporting the conclusion we here reach. * * * United States v. Levin, * * *"

Thereafter, the Court of Appeals for the Second Circuit, in which the district court in *Philippe* is located, in United States v. McCue, supra, commented:

> "The only case to which we have been cited which supports a contrary result is United States v. Philippe, 173 F.Supp. 582 (S.D.N.Y.1959). *We reject the reasoning and the result in that decision.*" (Emphasis supplied.)

I do not believe it can be seriously questioned but that, if the statute "be construed according to its literal and natural import" (*Gilliland,* supra), the acts of the appellant in this case constitute a clear violation of the statute involved. In *Van Valkenburg,* supra, the facts closely parallel those here. In that case the defendant made a positive effort to have a third person charged with a federal crime and for that purpose affirmatively stated to an Assistant United States Attorney that the person accused had stolen certain checks and cashed them by means of a forgery. The court, in overruling defendant's motion to dismiss the indictment, held that

> "Such governmental action (that sought by the defendant) is clearly within the jurisdiction of the office of the United States Attorney." (157 F.Supp., page 602)

The majority holds that the only "matters" within the purview of the statute are those concerning which the department or agency involved has "power to adjudicate rights, establish binding regulations, compel the action or finally dispose of the problem giving rise to the inquiry." This precise, definitive and unqualified pronouncement constitutes an absolute, inflexible criterion or test, by which the question of the applicability of this statute to any factual situation may be readily resolved. This conclusion is consistent with portions of the *reasoning* in *Levin* and *Stark,* but which reasoning was not necessary for the ultimate determination of those cases. In *my view such explicit and exclusive rule* is vulnerable because its sole basic thesis and justification is the proposition that Congress intended to use the word "jurisdiction" in this restrictive sense. Had this actually been the intent of Congress, its purpose could readily have been accomplished by inserting an appropriate descriptive or limiting clause. I am not persuaded that Congress, intending only to enlarge the area embraced by the then existing law so as to accomplish the purpose stated by the majority, would by the 1934 Amendment expressly enlarge the scope thereof, use therein the word "any" with reference to the statements, matters, departments or agencies involved and then, in order to effectuate the intended purpose of the law use the word "jurisdiction" in the restrictive sense as interpreted by the majority, well knowing that the applicability of the law within the intended area would ultimately depend upon judicial interpretation. I cannot ascribe to Congress the intent to use one word "of many meanings" in such a strict and narrow sense as would necessarily restrict and limit the clear and all-inclusive character of all the other essential words of the statute. Nor can I believe that, in this manner, Congress intentionally excepted, for all practical purposes, such an important governmental agency from the plain meaning of "any department or agency."

One readily perceptible and important effect necessarily resulting from the rigid criterion expounded by the majority is to exclude from the purview of Section 1001 all statements in any and all matters strictly criminal in character, irrespective of the governmental agency or department involved. This conclusion is in accord with that portion of the ex-

pressed reasoning found in *Stark,* supra, which is quoted with approval by the majority as being "sound and applicable", as follows:

"In like manner the important functions of the Department of Justice with respect to criminal offenses against the United States is the power to investigate and initiate prosecutions, but not the power to decide whether a criminal offense has been committed."

Thus, it necessarily follows that all statements in matters purely criminal in nature are excluded from the purview of the statute, for the final disposition thereof is by action of the trial court or jury. Should the returning of an indictment by a grand jury be construed as "compel(ling) the action" or satisfaction of this requirement, I point out that it is clear that a federal grand jury is not a "department or agency" within the meaning of the statute. Title 18, U.S.C.A. Section 6; United States v. Allen, 193 F.Supp. 954 (S.D.Cal.1961).

An examination of the case law reveals, in my view, a continuing tendency to progressively liberalize the interpretation of all of the words of the statute, as evidenced in part by subsequent rejection of portions of the reasoning found in *Levin* and *Stark*. There appears to me to be running as a common thread throughout most of the cited cases a clearly discernible emphasis placed upon the broad purpose of the statute as outlined in *Gilliland*; the broad, general and unfettered character of the language of the statute; the indication that the Supreme Court "rejects any theory of narrow applicability," and that the "Section contain(s) no suggestion of confining the effect of the statute to any smaller area than that encompassed by its own broad language." *McCue,* supra. It would seem reasonable that these guiding principles are also applicable (by inference, at least) to an interpretation of "jurisdiction", for it would appear that a narrow and restrictive understanding thereof could only be effected by a sharply different approach to the statute and in the attitude toward and understanding

of the purpose thereof. For cases cited in support of the proposition that "[t]he term 'jurisdiction' is not used in the Act in a technical sense.", see, *Ogden,* supra (303 F.2d, n. 73, p. 743).

It may be that our conflicting views are based in part upon divergent concepts of public policy and the application of a yardstick fashioned thereby. The majority frankly states that the "important social policy" of maintaining "an open line of communication between the general public and law enforcement agencies" influenced the ultimate decision, and states reasons why an interpretation of the statute contrary to that expressed would violate such policy. Again, I foresee no such adverse reaction or effect. I see no more reason why an individual, acting innocently and in good faith, would be any more reluctant to voluntarily give information to an agent of the F.B.I., well knowing of the existence of a law that provides a severe penalty for the knowing and intentional giving of false information to such agency, than would a witness be reluctant to testify, under oath, to facts which he believes to be true, well knowing of the perjury statute. Nor do I see any more probability that such construction would tend to discourage the voluntary giving of information in good faith, than knowledge of the existence of Section 1001 would have the effect of discouraging the making of proper and legitimate statements in matters within the jurisdiction of the departments and agencies conceded to be within the purview of that statute. I see no sound reason in principle, based on public policy or otherwise, why the statute should be construed as being applicable to "statements" made to investigative officers of agencies or departments which have the power to "finally dispose" of the matter in inquiry, but not applicable to statements of like character made to investigative officers of the F.B.I. or of any other agency or department which does not have such power of final disposition. The fact is, false statements made in matters peculiarly within the "investigative jurisdiction" and author-

 

ized governmental function of the Department of Justice may be exceedingly vicious and potentially dangerous and harmful to others, especially in matters relating to the protection and enforcement of important constitutional rights of private citizens. Such statements may relate to matters involving the safety and protection of important officers in one of the three branches of our government, and conceivably might have a direct and important bearing on our national security. Any such statements would necessarily initiate expensive and time-consuming proceedings by government agents and the substantial exercise by them of their authorized official functions—matters of much more public concern, in my opinion, than a relatively innocuous false civil claim for monetary benefit or personal privilege. In any event, policy wisdom is primarily for the consideration of the makers, rather than the interpreters, of the law, and we are here seeking to ascertain the congressional intent.

The Federal Bureau of Investigation is the investigative agency or arm of the Department of Justice, and is charged with investigating and detecting violations of the laws of the United States and collecting evidence in cases where the United States is or may be a party in interest, excepting those matters specifically assigned by Congress to other federal investigating agencies. This responsibility and duty has been judicially characterized as "investigating authority" and "primary investigative jurisdiction." One of the most important duties and responsibilities of the Department of Justice is the protection, preservation and enforcement of the constitutional rights of citizens under the Civil Rights Act. In the performance of those duties the Department of Justice must, and does, necessarily rely upon its investigative agency for the proper, efficient and unperverted exercise of its authorized responsibility. It is my opinion that the voluntary, knowing and willful giving by a person of material, false statements concerning alleged violations of his civil

rights by a state law enforcement officer, for the purpose of inducing reliance and action thereon, and thus instigating and causing an investigation as the basis for a subsequent prosecution of the person accused, necessarily perverts the authority and function of that agency. The false statement in this case related to a matter concerning which the F.B.I. had the sole responsibility to investigate—a fact undoubtedly known to the Appellant, who voluntarily and intentionally placed this information before that agency— which information was given for the conceded purpose of inducing that agency to rely thereon and did in fact cause that agency to act to the full extent of its authorized governmental function and purpose, thereby interfering with and perverting its normal activities.

I believe the statute is applicable to the specific factual situation in this case, and would therefore affirm.